**UNITED STATES of America,
Plaintiff–Counterdefendant/Appellant,**

v.

**$25,000 U.S. CURRENCY, Defendant,**

and

**Tomasino Gino Cirimele,
Claimant/Appellee.**

No. 85–5854.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 10, 1987.

Decided April 28, 1988.

Amended June 21, 1988.

Second Amended Aug. 8, 1988.

Ian Fan, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-counterdefendant/appellant.

Michael N. Berke, Sherman Oaks, Cal., for claimant/appellee.

Before NELSON, HALL and THOMPSON, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

The United States filed a civil forfeiture action pursuant to 21 U.S.C. § 881(a)(6) against money seized from Tomasino Cirimele ("Cirimele") following his arrest at Los Angeles International Airport. Cirimele moved to suppress the evidence obtained from him at the airport. The district court granted Cirimele's motion, stating that the agents did not have a reasonable and articulable suspicion of criminal activity so as to justify Cirimele's detention. Cirimele thereafter moved for summary judgment against the government in the forfeiture action. The district court granted the motion, finding that the government had failed to establish probable cause to forfeit. We find that the district court erred in granting Cirimele's motion to suppress and his motion for summary judgment. The district court's ruling is reversed and this case is remanded to the district court for further proceedings.

I

On November 10, 1982, a Drug Enforcement Agent ("D.E.A.") from Atlanta relayed information to D.E.A. Joseph Leszczynski, in Los Angeles, that narcotics couriers were using an Eastern Airlines flight from Los Angeles to Miami to transport the profits of narcotics transactions. The information given to the agent was that the couriers were generally unaccompanied males who traveled without checked baggage, and stayed in Miami a brief time before returning to Los Angeles.

On November 16, 1982, Agent Leszczynski and Detectives Farrant and Haldi of the

Los Angeles Police Department observed Cirimele leaving a car that had pulled up to the curb outside the Eastern Airlines terminal. Cirimele carried only a blue nylon gym bag. The car immediately sped away from the curb and Cirimele did not exchange any good-byes with the occupant. Cirimele then walked to the Eastern Airlines ticket line, purchased a ticket, and took a seat on the left end of a nearby bench. Beside him at the end of the bench was a pillar, and along the back of the bench was a glass wall. As he sat on the bench, Cirimele guarded his bag carefully between his legs and appeared anxious.

Agent Leszczynski and the two detectives approached Cirimele and identified themselves. Cirimele was seated as the officers approached. After Farrant identified himself, Cirimele stood up and turned to face Farrant who had approached from the right. At this point the pillar at the end of the bench was three or four feet behind Cirimele. Farrant stood about two feet in front of Cirimele; he faced the pillar behind Cirimele. Agent Leszczynski stood behind and to one side of Farrant, four or five feet from Cirimele. Haldi also stood behind Farrant. Detective Farrant asked if he could speak with Cirimele for a few minutes. Cirimele said "Yes." Detective Farrant then asked Cirimele if he would mind showing him some identification. Cirimele produced identification in the form of an alien identification registration card issued in the name of Tomasino Cirimele. Farrant then asked Cirimele if he would mind showing him his airline ticket. Cirimele produced an airline ticket issued to a D. Chili. Farrant inquired why the names were different on the ticket and the registration card. Cirimele mumbled something unintelligible.

Detective Farrant told Cirimele that he was conducting a narcotics investigation and asked Cirimele if he was transporting narcotics. Cirimele said, "No." Farrant requested permission to search Cirimele's bag and Cirimele said that Farrant could do so. A search of the bag produced two airline tickets dated November 12, 1982, for travel from Fort Lauderdale, Florida, to Los Angeles, California. The tickets were issued to a Tony Roma and a D. Tomasino.

The detective also found objects from hotels in Southern California. Farrant showed Cirimele the two used airline tickets issued under different names and asked him, "What are these?" Cirimele replied that he and a friend flew out from Florida; one ticket belonged to Cirimele and one belonged to his friend.

By this point, Detective Haldi had moved from his position behind Farrant to a position behind Cirimele. He stood between Cirimele and the pillar. Farrant noticed Haldi pointing toward Cirimele's outside jacket pocket. Haldi then stepped back away from Cirimele. Farrant observed rolls of money in the jacket pockets. Farrant testified that there "was so much money in there, the pocket was puffed out, both of the pockets." Farrant then inquired why the used tickets were not in Cirimele's name. Cirimele again mumbled something that Farrant could not understand. After this reply, Farrant asked Cirimele if he was carrying narcotics on his person. Cirimele said, "No, just money." Farrant asked Cirimele how much money he had and Cirimele responded, "$25,000."

Farrant then asked Cirimele if he would accompany him to his office to "check everything out." Cirimele stated that he did not mind going but he did not want to miss his flight. Farrant assured Cirimele that he would make his flight if there were no other problems.

The office, a twenty-five foot long house trailer between two of the airport terminals, was located about a hundred feet away from the area where the agents approached Cirimele. When they arrived at the office, Farrant ran a check to determine whether Cirimele was wanted; he was not. Agent Leszczynski asked Cirimele if he could search his wallet for additional identification. Cirimele allowed Leszczynski to do so. The search produced a small paper bundle of cocaine. Cirimele was placed under arrest. Leszczynski requested Cirimele to put everything he had on the table. Cirimele then pulled out $25,000 in U.S. currency from his jacket, socks, and pockets.

The government filed a civil forfeiture action pursuant to 21 U.S.C. § 881 against the currency on April 7, 1983. On July 26, 1984, the district court granted Cirimele's motion to suppress the evidence obtained by the officers subsequent to the initial questioning. On March 12, 1985, the district court entered summary judgment in favor of Cirimele, concluding that the government had failed to establish probable cause to forfeit. The government appeals the district court's grant of the motion to suppress and the summary judgment entered in favor of Cirimele.

II

The basic issue before us is whether the district court correctly granted Cirimele's motion to suppress the evidence obtained during the encounter with the agents in the terminal, and from the search of the bag there, as well as the evidence obtained from the search in the D.E.A. office. The district court held that Cirimele was "seized" under the fourth amendment at the time of the initial encounter, and that the agents did not have a reasonable and articulable suspicion of criminal activity that justified Cirimele's detention at that point. Therefore, the court suppressed the evidence that was obtained during the detention.

■ We review de novo the district court's grant of Cirimele's motion to suppress, and we uphold its findings of fact unless they are clearly erroneous. *United States v. Mitchell* 812 F.2d 1250, 1253 (9th Cir.1987). The ultimate conclusion of the lawfulness of a seizure is a mixed question of law and fact that we review de novo. *Id.*

We must first determine whether Cirimele was seized within the meaning of the fourth amendment at the time of the initial encounter. If he were not seized at that time, we must determine whether he was

seized at any later point, and whether, at that point, there was a fourth amendment violation. If there were a fourth amendment violation, the evidence obtained must be suppressed. *See Weeks v. United States*, 232 U.S. 383, 398, 34 S.Ct. 341, 346, 58 L.Ed. 652 (1914).[1]

It is well-established that not every police encounter is a seizure as defined by the fourth amendment. *See, e.g., Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality); *United States v. Erwin*, 803 F.2d 1505, 1508 (9th Cir.1986).

[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, [or] by asking him if he is willing to answer some questions....

*Royer*, 460 U.S. at 497, 103 S.Ct. at 1324. An individual is "seized within the meaning of the fourth amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (Stewart, J.). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968).

■ Cirimele argues that he was seized when the officers approached him in the airport concourse and identified themselves, since he was "surrounded" by the officers and blocked by a concrete pillar. He states that a reasonable person in this situation would not have felt free to leave. However, the evidence in the record does not substantiate this claim. Agent Leszczynski was standing four to five feet away

---

1. Although the district court only found that Cirimele was seized at the initial encounter, we analyze whether a fourth amendment violation occurred at *any* point during the encounter because we may affirm the district court's ruling on any basis presented by the record. *See Trerice v. Pedersen*, 769 F.2d 1398, 1400 (9th Cir. 1985). That is, we may affirm the district court's correct legal results even if they were reached for the wrong reasons. *Bruce v. United States*, 759 F.2d 755, 758 (9th Cir.1985). If we find that a fourth amendment violation occurred at a later time than the initial encounter, we can affirm the district court's suppression of the evidence thus obtained.

from Cirimele and Cirimele could have easily walked around the pillar and the officers. From where the officers were standing, neither the pillar nor the officers prevented Cirimele from leaving the area. The officers showed no sign of force or aggression, and at no time did they raise their voices or show their firearms. Therefore, Cirimele was not seized at the point of the initial encounter in the airport concourse. *See Erwin,* 803 F.2d at 1508 (no seizure where stop occurred in public place and there was no show of force). *Cf. United States v. Sokolow,* 831 F.2d 1413, 1416 (9th Cir.1987) (defendant seized when agents grabbed him by the arm, pulled him onto the walkway, and sat him down at the curb), *cert. granted,* — U.S. —, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988).

■ Likewise, Cirimele was not seized when the detective asked him for his identification and airline ticket. Under *Royer,* asking for and examining Cirimele's ticket and his alien registration card were permissible. *See Royer,* 460 U.S. at 501, 103 S.Ct. at 1326 (requesting and examining airline ticket and driver's license were "no doubt permissible in themselves"). In *United States v. Erwin,* this court held that initial questioning and request for identification did not implicate fourth amendment rights under circumstances almost identical to those here. 803 F.2d at 1506–07, 1508 (a reasonable person would not have believed that he was not free to leave when approached in parking lot and asked for identification and ticket).[2] Other circuits are in accord. *See United States v. Poitier,* 818 F.2d 679, 682 (8th Cir.1987) (asking for identification did not fall into the category of an investigatory stop), *cert. denied,* — U.S. —, 108 S.Ct. 700, 98 L.Ed.2d 651 (1988); *United States v. Black,* 675 F.2d 129, 136 (7th Cir.1982) (request for and examination of driver's license and airline

ticket not a seizure), *cert. denied,* 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983); *United States v. Jensen,* 689 F.2d 1361, 1363–64 (11th Cir.1982) (officers' request for identification and inquiry whether defendant was carrying drugs did not constitute seizure). Based on *Royer, Erwin,* and the law of other circuits, we hold that Cirimele was not seized for purposes of the fourth amendment at the time of the initial encounter nor at the time he was asked for his airline ticket and identification.

■ Because Cirimele was not seized at the point of the initial encounter or request for identification, we must determine if at some later point he was seized within the meaning of the fourth amendment.[3] After the initial questioning, the officers requested permission from Cirimele to search his bag. Detective Farrant testified that Cirimele allowed him to conduct the search. The request to search the bag is not a seizure within the fourth amendment. There is no fourth amendment violation when an officer stops an individual and poses a question to him. *Royer,* 460 U.S. at 497, 103 S.Ct. at 1324. In *Erwin,* discussed above, the officers asked the defendant if he had any drugs in his possession, and if they could search his bag. *Erwin,* 803 F.2d at 1507. He refused. *Id.* The officers then detained the bag and allowed Erwin to leave. *Id.* The district court held, and we agreed, that this initial questioning did not implicate his fourth amendment rights, although the actual seizure of the bag *without Erwin's consent* required reasonable suspicion. *Id.* at 1508. Thus, under *Erwin,* when the detectives asked Cirimele if they could search his bag, there was no seizure under the fourth amendment.

**2.** In *United States v. Patino,* 649 F.2d 724 (9th Cir.1981), we concluded that the defendant was "seized" at the point she was stopped and asked to show her identification and airline ticket. *Id.* at 728. This case was decided prior to *Royer* and *Erwin,* which we believe control here.

**3.** Contrary to the suggestion of the dissent, we adhere to the requirement that reasonable suspicion exist before an investigatory stop is made.

We simply hold that at the time of the initial questioning and at the time of the request for identification, no seizure occurred because a reasonable person would have believed he was free to leave. Because there was no seizure, the reasonable suspicion requirement of the fourth amendment does not apply. In contrast, later in this opinion we discuss the existence of reasonable suspicion when Cirimele went to the D.E.A. office.

■ In order for the search of the bag to be legal, the consent must have been voluntary and not the result of duress or coercion. *Schneckloth v. Bustamonte,* 412 U.S. 218, 248, 93 S.Ct. 2041, 2059, 36 L.Ed. 2d 854 (1973). Determining whether the consent was voluntary depends upon the totality of the circumstances, *id.* at 248–49, 93 S.Ct. at 2059, and is a question of fact reviewed under the clearly erroneous standard. *United States v. Licata,* 761 F.2d 537, 544–45 (9th Cir.1985) (defendant's consent to search a package was valid where he clearly understood his rights, did not suffer from a lack of education or intelligence, and the agents did not act in a coercive manner).

This court, in *United States v. Nikzad,* 739 F.2d 1431 (9th Cir.1984), addressed the question of whether the defendant consented to the search of his luggage. Nikzad's nervous behavior in the baggage claim area caught the attention of D.E.A. agents. *Id.* at 1432. The agents approached Nikzad outside of the terminal and asked to speak to him. *Id.* He was told he was free to leave but he agreed to talk to the agents. *Id.* The agents then asked permission to search his suitcase. *Id.* Although Nikzad was told he did not have to consent to the search, he allowed the officers to search the bag. *Id.* This court held that the initial stop was a valid *Terry* stop, *see Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), but that there was inadequate evidence in the record to determine if the consent to search the luggage was valid, and remanded this question to the district court. *Id.* at 1433.

■ Under our holding in *Nikzad,* there is insufficient evidence in the record to determine if Cirimele freely and voluntarily consented to the search of the bag. In this case, Cirimele was asked by Detective Farrant if he could search the bag and he responded, "Yes". Cirimele contends that

he did not understand English well enough to consent freely. The government argues that Cirimele appeared to understand English well enough to know what was happening. Detective Farrant testified that Cirimele spoke English very well and appeared to understand it. This factual dispute is for the district court, and we therefore remand this question of whether Cirimele freely consented to the search of the bag.

If the district court finds that Cirimele consented to the search of the bag, then the search was legal. *Royer,* 460 U.S. at 501, 103 S.Ct. at 1326. In addition, the product of the search would be admissible evidence. *Id.* at 502, 103 S.Ct. at 1326.[4]

■ If Cirimele voluntarily consented to the search of the bag, the district court must address whether Cirimele was seized for purposes of the fourth amendment at a later point. After the search, Detective Farrant asked Cirimele if he would accompany the officers to their office, which was located one hundred feet away, "to check everything out." Cirimele said that he did not mind going, but that he did not want to miss his flight. The agents assured Cirimele that he would not miss his flight if everything checked out. On remand, the district court must determine whether Cirimele voluntarily consented to accompany the officers.

If the district court determines that Cirimele did not voluntarily consent to go to the D.E.A. office, the court must then determine whether the initial encounter in the airport concourse, which in itself did not violate the fourth amendment, escalated into a seizure when Cirimele was taken to the D.E.A. office. *See Royer,* 460 U.S. at 503, 103 S.Ct. at 1327; *United States v. Moreno,* 742 F.2d 532, 536 (9th Cir.1984).[5]

■ If the district court determines that Cirimele was seized when he was taken to

---

**4.** Upon searching the bag, Detective Farrant discovered: (1) two airline tickets dated November 12, 1982 for travel from Fort Lauderdale, Florida, to Los Angeles, California, which were issued under the names Tony Roma and D. Tomasino; (2) a hotel room key, a pad of paper and a business card from a Redondo Beach, California hotel; (3) a pen from a Long Beach, Califor-

nia hotel; and (4) a mending kit and first aid kit from a Los Angeles, California hotel.

**5.** We note that, unlike the situation in *Royer* or *Moreno,* there is no indication that the agents retained Cirimele's bag either when he was escorted to the office or while he was present in the office. In fact, one agent recalls that Cirimele carried his own bag to the D.E.A. office.

the D.E.A. office, it must decide whether the seizure was a valid investigatory stop. In order for an investigatory stop to be valid under the fourth amendment, the officers must have had a reasonable and articulable suspicion that Cirimele had committed or was about to commit a crime. *Royer*, 460 U.S. at 498, 103 S.Ct. at 1324; *Sokolow*, 831 F.2d at 1417.

The district court must consider what the officers knew at the point when Cirimele was taken to the office: (1) Cirimele had made a quick exit from a car without "exchanging good-byes" with the driver; (2) He carried only a duffle bag; (3) He appeared anxious; (4) He was to board an Eastern flight to Miami, a city known to have a high level of drug activity; (5) He was traveling under an assumed name; (6) The contents of the bag discovered during the search (if the district court finds there was valid consent), including two tickets issued under different names; (7) Cirimele had $25,000 in currency stuffed in his pockets; and (8) Cirimele had failed to answer intelligibly two questions regarding his use of aliases. The district court must determine whether these facts, taken collectively, establish the requisite suspicion necessary to detain Cirimele.[6] *See Erwin*, 803 F.2d at 1510–11.

In addition, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. *Royer*, 460 U.S. at 500.

In *Royer*, a plurality of the Supreme Court determined that the circumstances surrounding the questioning did not meet this test. Royer was taken to a small room characterized as a "large closet" with one desk and two chairs. *Royer*, 460 U.S. at 502, 103 S.Ct. at 1327. In addition, the plurality said there was no reason indicated

in the record for transferring the site of the interrogation to the small room. *Id.* at 505, 103 S.Ct. at 1328. The plurality also stated that the state failed to touch on the question of "whether it would have been feasible to investigate the contents of Royer's bag in a more expeditious way." *Id.*

Cirimele was taken approximately one hundred feet to a large office, unlike the "large closet" in Royer. The office was a house trailer approximately 25 feet long, furnished with desks, telephones, and filing cabinets. It was large enough to accommodate four people comfortably. There was also a definite purpose for the trip to the office. The officers wanted to further identify Cirimele by running a computer check to see if he was wanted (which could not have been done in the concourse) and possibly to conduct a further search.

To determine whether the length of the detention was no longer than necessary to effectuate the purpose of detaining Cirimele the district court should consider that the officers needed only a few minutes to determine that Cirimele was not wanted and to search Cirimele's wallet for additional identification. While they were doing this they discovered that Cirimele had cocaine in his possession. If the encounter was justified on the basis of reasonable suspicion and if the encounter was sufficiently limited to satisfy the conditions of an investigative seizure, there would be no fourth amendment violation, even if the district court determined that Cirimele was seized when he was taken to the office.

The final question the district court must address is whether Cirimele consented to the search of his wallet. It is not clear whether Cirimele had a sufficient command of the English language to consent freely. *See Nikzad*, 739 F.2d at 1433.

### III

We hold that the district court erred when it granted Cirimele's motion to sup-

---

6. This case is different from *United States v. Sokolow*, 831 F.2d 1413 (9th Cir.1987), *cert. granted*, —— U.S. ——, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988). In *Sokolow* we placed limits on detentions based solely upon "personal characteristics shared by drug couriers and the

public at large," such as nervousness and travel to a "drug source" city. We contrasted situations in which the suspect exhibits behavior consistent with an ongoing crime, such as traveling under an alias. *Id.* at 1419–20.

press. On remand, the district court must consider whether Cirimele consented to the search of his bag and wallet. The court must also determine whether Cirimele consented to accompany the officers to the office; if Cirimele did not consent, the court must determine whether he was seized then. The court then must consider the legally obtained evidence in order to determine whether there exists probable cause to forfeit the currency. *See United States v. $93,685.61 in U.S. Currency*, 730 F.2d 571, 572 (9th Cir.1984), *cert. denied*, 469 U.S. 831, 105 S.Ct. 119, 83 L.Ed.2d 61 (1984).

REVERSED and REMANDED.

NELSON, Circuit Judge, dissenting.

I respectfully dissent. This case should be remanded to the district court for a determination whether Cirimele felt free to leave at the time he was initially questioned and detained. If the officers did not possess founded suspicion at the moment the investigatory stop occurred, *see Guam v. Ichiyasu*, 838 F.2d 353, 355 (9th Cir. 1988), the development of that suspicion during the detention cannot be used to support the initial stop. *United States v. Espinosa*, 827 F.2d 604, 608 (9th Cir.1987); *United States v. Erwin*, 803 F.2d 1505, 1510 n. 2 (9th Cir.1986); *see also Bumper v. North Carolina*, 391 U.S. 543, 548 n. 10, 88 S.Ct. 1788, 1791 n. 10, 20 L.Ed.2d 797 (1968) (search not justified by what it turns up).

A Fourth Amendment stop based on hunches alone will not withstand constitutional scrutiny. *United States v. Kerr*, 817 F.2d 1384, 1387 (9th Cir.1987). As a threshold matter, *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) controls our analysis of the existence of a reasonable suspicion to support a brief investigatory stop. While it is true under *Royer* that the Fourth Amendment is not violated by merely approaching someone in a public place, *Royer* further holds that when evaluating a police stop, an individual "may not be detained even momentarily without reasonable, objective grounds for doing so." *Royer*, 460 U.S. at 498, 103 S.Ct. at 1324.

Under this standard, even for an investigative stop, "[i]t is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Royer*, 460 U.S. at 500, 103 S.Ct. at 1326. Moreover, the agents must show that the means used during the investigatory stop were the least intrusive means readily available. *Ichiyashu*, 838 F.2d at 356; *Kraus v. County of Pierce*, 793 F.2d 1105, 1108 (9th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1571, 94 L.Ed.2d 763 (1987). This, appellants have not done. Alternatively, the district court must determine whether Cirimele's consent to answer questions or to allow the bag search "was in fact 'voluntary' or was the product of duress or coercion, express or implied." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973). Whether Cirimele consented to the stop "is a question of fact to be determined from the totality of the circumstances." *Id.*

I. THE INITIAL STOP

The majority parses the reasoning of *Royer* to reach the implicit conclusion that no degree of suspicion is necessary for an airport stop and questioning. Such a conclusion is inconsistent with the narrow exception to probable cause accorded *Terry* stops. "Although not all seizures require probable cause, 'any curtailment of a person's liberty by the police must be supported by at least a reasonable and articulable suspicion that the person is engaged in criminal activity.'" *United States v. Sokolow*, 831 F.2d 1413, 1417 (9th Cir.1987) (quoting *Reid v. Georgia*, 448 U.S. 438, 440, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980)). Because the very nature of airport stops renders them intimidating, the presumption raised by a police stop at an airport is that a reasonable person would not feel free to leave. *United States v. Berry*, 670 F.2d 583, 596–97 (5th Cir. Unit B, 1982) (en banc). The reasoning of the Eleventh Circuit is persuasive; we should "scrutinize the record with care to ensure that the totality of the circumstances

shows an utter absence of coercion and hence truly voluntary consent." *United States v. Elsoffer*, 671 F.2d 1294, 1297 (11th Cir.1982); *See also United States v. Espinosa–Guerra*, 805 F.2d 1502, 1507 (11th Cir.1986).

### A. Coerciveness of the Initial Stop.

The majority's holding that a reasonable person would have felt free to leave under the circumstances confronting Cirimele is unsupported by the record. Whether an initial encounter with police rises to the level of a seizure is a highly factual question that is heavily dependent on the circumstances. *United States v. Black*, 675 F.2d 129, 134 (7th Cir.1982), *cert. denied*, 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983). The determination whether a reasonable person feels free to leave a police-citizen encounter is a question of fact. *Erwin*, 803 F.2d at 1508. This court reviews a finding that an encounter is consensual for clear error. *United States v. Combs*, 762 F.2d 1343, 1349 (9th Cir.1985).

The district court issued no findings as to the coerciveness of the initial stop. The court noted only that these "circumstances are probably about the worst that I have seen in all of the cases that I have seen." Reporter's Transcript, June 25, 1984 suppression hearing at 7. Therefore it assumed this encounter was a coercive, investigatory stop, and it proceeded to determine whether an articulable suspicion existed to support the stop. The facts of this case support the district judge's reasoning that an investigatory stop occurred, necessitating an objectively reasonable or founded suspicion on the part of the agents that criminal activity was to occur in order to justify stopping and questioning Cirimele. *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981); *Kerr*, 817 F.2d at 1386.

Even if I were to adopt the majority's perspective of *Royer*, this court must first assess whether a coercive atmosphere existed which elevated the initial questioning into an investigatory stop requiring reasonable suspicion. The relevant test is whether, at the time of the initial stop and questioning, the agents exhibited "a show of official authority such that 'a reasonable person would have believed that he was not free to leave.'" *Royer*, 460 U.S. at 502, 103 S.Ct. at 1326 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980)). The majority engages in fact-finding by abstracting parts of the officers' testimony to find that nothing prevented Cirimele from leaving the area. In relying on this testimony, instead of waiting for the facts to be found by the district court, the majority neglects other perspectives of the encounter. The question that the majority fails to pose or answer is whether Cirimele felt free to leave. The officers never testified that Cirimele was in fact free to leave or that they communicated this option to Cirimele.

We must assess other factors to determine the coerciveness of the initial questioning. While a show of physical force certainly demonstrates a show of authority, see *United States v. Sokolow*, 831 F.2d at 1416, the absence of such force does not automatically determine whether a reasonable person feels free to leave. *See United States v. Beraun–Panez*, 812 F.2d 578 (9th Cir.1987). "[T]he number and position of the officers have been recognized as important considerations for determining whether an atmosphere of restraint can be said to have existed." *United States v. Berryman*, 717 F.2d 651, 655 (1st Cir.1983); *United States v. Nicholas*, 448 F.2d 622 (8th Cir.1971); *Horvitz v. State*, 433 So.2d 545 (Fla.App.1983) (defendant surrounded by three officers).

The agents' manner of approach and the tone and extent of their questioning are factors that indicate whether a subject is free to depart. *United States v. Beraun–Panez*, 812 F.2d at 580 (quoting *United States v. Hall*, 421 F.2d 540, 545 (2d Cir. 1969) *cert. denied*, 397 U.S. 990, 90 S.Ct. 1123, 25 L.Ed.2d 398 (1970)). In this case, three Drug Enforcement Administration (DEA) agents surrounded Cirimele upon initially approaching him. Given the physical layout of the airport, the agents' actions create substantial similarities between this stop and the impermissible seizure in *Royer*. The agents positioned themselves around Cirimele, immediately

identified themselves as police officers investigating narcotics transactions, questioned Cirimele regarding narcotics possession, and neglected to inform Cirimele that he was not under arrest and was free to leave. *See e.g., Espinosa,* 827 F.2d at 608 (initial detention occurred when officers stopped, requested identification, and questioned suspect regarding narcotics transaction). In explaining the conclusion that Cirimele could have circumnavigated the officers, the majority neglects to mention other testimony or "facts" that support a finding of coerciveness. For instance, the questioning officer stood one to one and one half feet directly in front of Cirimele. One of the officers testified that they immediately identified themselves as police officers upon approach, showed their identification and stated that they were conducting an investigation, before asking any questions of Cirimele. One officer testified that he did not remember the exact sequence of events although he later stated that Farrant first requested Cirimele's identification before asking him if he was carrying narcotics. Another officer testified that they informed Cirimele that they were conducting a narcotics investigation and asked whether he was carrying narcotics before receiving his identification. This detailed recital of the testimony shows only that the district judge should first have the opportunity to sort through the testimony and make factual findings before this court determines issues of coercion and consent without the benefit of factual findings.

The majority also fails to consider Cirimele's language difficulties at this point. Cirimele's language ability is germane to the question of whether he believed that he was free to leave at the time of the initial questioning. In *United States v. Moreno,* 742 F.2d 532 (9th Cir.1984) this court held that the degree of coercion is heightened when the suspect has "at best a very limited command of the English language." *Id.* at 536. In addition, the *Moreno* court found that a reasonable person standard incorporated the special factors of Moreno's alien status. "Moreno's lack of familiarity with police procedures in this country, his alienage, and his limited ability to speak and understand the English language contributed significantly to the question of coercion present at the DEA office." *Id.* at 536. *See also Espinosa–Guerra,* 805 F.2d at 1508 ("Most fundamental, however, is the fact that the agent and appellee were not able to communicate").

The record shows that one of the first questions asked of Cirimele was whether he spoke and understood English. Agent Farrant testified that this question was prompted by Cirimele's foreign appearance and thick accent. It was immediately obvious to the DEA agents that Cirimele had, at best, a limited command of English. The above factors combine to create a question as to the presence of psychological coerciveness, that would prevent a reasonable immigrant from believing that he was free to leave. *See Beraun–Panez,* 812 F.2d at 582 (approving of the refined objective test which considers illegal alien status or language difficulties when determining the coerciveness of an investigatory stop); *United States v. Patino,* 649 F.2d 724, 728 (9th Cir.1981) (noting language problem as a factor affecting the presence of coercion). *See also United States v. Alvarez–Sanchez,* 774 F.2d 1036, 1042 n. 8 (11th Cir. 1985) (language barrier can be considered a factor indicating that an individual does not feel free to leave). Therefore, even if analyzing this case under the majority's approach, I would remand to the district court to determine whether the circumstances surrounding the initial approach culminated in a coercive atmosphere such that Cirimele did not feel free to leave. Certainly, this court possesses inadequate facts to conclude that "Cirimele was not seized at the point of the initial encounter in airport concourse."

### B. *Presence of a Reasonable and Articulable Suspicion.*

In *Reid v. Georgia,* a case involving an investigatory airport stop based on general drug courier profile characteristics similar to those relied on here, the Supreme Court focused on the existence of a reasonable and articulable suspicion possessed by the agents to determine whether an investigatory stop occurred. *Reid,* 448 U.S. at 440–41, 100 S.Ct. at 2753–54. The crucial question in *Reid,* properly the focus of the

district court's holding here, was whether the agents possessed knowledge of specific and articulable facts regarding criminal activity at the time of the initial questioning.

Under these facts, no valid, articulable suspicion could have been formed by the agents. The district court held that at the time of the stop the agents had observed only the following general characteristics: (1) Cirimele's 'quick exit from a car without exchanging goodbyes' with the driver, (2) the fact that Cirimele carried a gym bag and no other luggage, (3) his 'anxious appearance,' and (4) his scheduled flight to Miami, 'a city known to have a high level of drug activity.' These general characteristics describe a large number of innocent travelers and are similar to those characteristics held to provide an insufficient basis for an investigatory stop in *Reid*, 448 U.S. at 441, 100 S.Ct. at 2754; *Espinosa*, 827 F.2d at 609; *see also United States v. Erwin*, 803 F.2d 1505, 1511 (9th Cir.1986). Even "facts that bear some reasonable correlation to a suspicion of ongoing criminal activity but also describe a very large category of presumably innocent travelers cannot support a reasonable suspicion by themselves." *Sokolow*, 831 F.2d at 1419. Here the agents failed to augment the drug courier profile factors with particularized evidence regarding Cirimele's ongoing criminal activities. *Id.* Thus, the government does not establish sufficient founded suspicion for an investigatory stop.

## II. RETENTION OF THE TICKETS AND IDENTIFICATION.

After informing Cirimele that they were DEA agents investigating drug transactions, asking him repeatedly whether he was carrying drugs, examining Cirimele's identification card and airline ticket and searching his gym bag, the agents asked Cirimele to accompany them to the office for further investigation. At this point, the majority directs the district court to determine whether Cirimele freely consented to accompany the officers to the DEA office. If the district court finds that Cirimele was "seized" within the meaning of the fourth amendment, the majority directs the district court to decide whether the seizure was "a valid investigatory stop." However, by this time the seizure may have ripened into a detention such that probable cause was needed to continue the detention and search.[1] *See Royer*, 460 U.S. at 502–03, 103 S.Ct. at 1326–27. If the agents retained Cirimele's identification and airline ticket, then the degree of coerciveness present would be indistinguishable from the impermissible seizure in *Royer*, 460 U.S. at 503, n. 9, 103 S.Ct. at 1327 n. 9; *United States v. Robinson*, 690 F.2d 869, 875 (11th Cir.1982) (length of retention of suspect's ticket and identification an important factor in determining consent to airport stop or search). Therefore, I would remand to the district court to determine whether the agents retained possession of Cirimele's ticket and identification such that Cirimele would have felt unable to leave the agents' presence in order to catch his flight. See *United States v. Black*, 675 F.2d 129, 140 (7th Cir.1982) (Swygert, J. dissenting) and cases cited therein.

Moreover, the majority further restricts the proper functions of the district court by finding that the officers possessed a definite, presumably legitimate, purpose for removing Cirimele to the DEA office. The district court did not reach the factual issues concerning the officers' actual purpose or the legitimacy of any possible purposes. Thus, *Royer's* suggestion that some movement of a suspect may be justifiable should not be used as a springboard to expand the ability of police to remove suspects into detention without probable cause or a warrant. Clearly one result of removing Cirimele from the public concourse was that Cirimele would be more intimidated and thus more likely to consent

---

1. The majority seems to indicate that the district court should characterize the seizure as either an investigatory detention or as no seizure at all. However, the inquiry at this point properly involves whether this seizure was an investigatory detention or an arrest. Thus, the district court should first determine what the seizure was, taking into consideration the full range of options, and then the court should decide whether the seizure was supported by the requisite degree of suspicion or probable cause. Only then should the district court determine, if the detention in the DEA officer was lawful, whether Cirimele freely consented to the search of his wallet.

to the search of his belongings or his person. *See United States v. Mendenhall,* 446 U.S. 544, 563, 100 S.Ct. 1870, 1882, 64 L.Ed.2d 497 (1980) (Powell, J., concurring) (noting that detaining and questioning a suspect in a public place is inherently less coercive than doing so in private).

Instead of instructing the district court on the possibility that the district court found consent to search the bag or consent to accompany the officers to the DEA office, I would remand this case for a factual finding regarding the coerciveness of and consent to the initial stop and questioning. If the circumstances surrounding the investigatory stop are found to be coercive, any evidence obtained as a result of that illegal stop might trigger suppression. *See Brown v. Illinois,* 422 U.S. 590, 603, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975). Because the constitutionality of all stages of this search cannot be determined without factual findings as to the coerciveness of the initial stop and the presence of founded suspicion, I do not offer guidelines to the district court regarding the subsequent aspects of the search.