67 F.3d 309
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Rigoberto GARCIA-SOLORZANO and Senel Ramos-Toros, Defendant-Appellant.
 Nos. 94-30447, 94-30448.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Sept. 13, 1995.
Decided Sept. 28, 1995.
 
 Before: WRIGHT, ALARCON and CANBY, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Senel Ramos-Toro (Ramos) and Rigoberto Garcia-Solarzano (Garcia) appeal from their judgment of conviction. Ramos and Garcia seek reversal on the ground that the district court erred in denying their motion to suppress evidence found in their luggage as the fruit of an unlawful seizure. Ramos and Garcia further contend that the district court erred in denying their motion to suppress because their consent to search was coerced.
 
 
 3
 Garcia separately argues that the district court erred in denying his motion to suppress all the statements he made to Drug Enforcement Agency (DEA) agents, including his consent, after he was asked whether he was in this country legally. Garcia maintains that his responses to the agents' subsequent questions were inadmissible because he was not advised of his rights as required by Miranda v. Arizona, 384 U.S. 436 (1966). Garcia also asserts that there was insufficient evidence to support his conviction. Garcia further maintains that the district court erred in denying his request for a four-point reduction for being a "minimal" participant in the crime. We affirm because we conclude that each of these contentions lacks merit.
 
 
 4
 * The facts of this action are not in dispute. The record demonstrates that Agent Scott Pierson and Detective Ronald Copeland (collectively, "the officers") approached Ramos and Garcia in the Seattle Amtrak station, presented their drug enforcement credentials, and asked to speak with them for a moment. Ramos and Garcia agreed. They were not asked to stop nor were they told they were not free to leave. There is no evidence in the record that the officers displayed weapons, made a show of force, raised their voices, or otherwise restrained Ramos and Garcia in any way.
 
 
 5
 The officers asked Ramos and Garcia to step aside because they were blocking the exit. Ramos and Garcia complied. They left the black suitcase, which they had been carrying between them, in the doorway. Agent Pierson moved the black bag after he obtained permission from Ramos and Garcia.
 
 
 6
 Agent Pierson asked to see Ramos' train ticket. Ramos produced four tickets in the name of Richard Fleischer. The officers asked Ramos and Garcia for identification. Both Ramos and Garcia produced California driver's licenses, reflecting their own names. Neither Ramos nor Garcia produced any identification in the name of Richard Fleischer. The officers inspected the tickets and driver's licenses and returned them. Agent Pierson then asked Garcia where he was born. Garcia responded that he was born in Mexico and that he did not have a green card or a visa. Agent Pierson asked Garcia whether he was in this country legally. Garcia did not respond. The officers did not question Garcia further regarding his immigration status.
 
 
 7
 The officers then began questioning Ramos and Garcia about the bags they were carrying when they departed the Amtrak train. Officer Pierson testified that he asked Ramos and Garcia if they knew what was in the bags that they had indicated belonged to them individually. He also asked them if they knew what was in the black bag. Both stated they were aware of the contents of their own bags, as well as the contents of the black bag. Ramos and Garcia were asked if they were carrying anything for anyone else in any of the bags. Both stated they were not. The officers then requested permission to search the luggage. Ramos and Garcia consented to a search verbally and in writing. The search of the black bag disclosed two stereo speaker cabinets containing slightly less than five kilograms of cocaine.
 
 II
 
 8
 Ramos and Garcia allege that the district court erred in denying their motion to suppress the evidence of the cocaine found in their luggage. They maintain that their consent was the fruit of an unlawful temporary detention or seizure. Ramos and Garcia assert that they were illegally seized when they were "accosted by DEA agents and compelled to reveal information [to those agents] by their show of official authority [which] transformed the stop into a seizure." Ramos' br. at 11. Neither Ramos nor Garcia argues that they were placed under arrest prior to consenting to the search. Accordingly, the question whether their consent was the fruit of an unlawful arrest is not before us. We review the denial of motions to suppress de novo. United States v. Becker, 23 F.3d 1537, 1539 (9th Cir.1994). We review de novo whether an individual is temporarily detained or seized under the Fourth Amendment. United States v. Johnson, 903 F.2d 1219, 1221 (9th Cir.), cert. denied, 498 U.S. 985 (1990).
 
 
 9
 We employ a three-tiered analysis to determine whether a defendant's Fourth Amendment rights were violated. United States v. Ayarza, 874 F.2d 647, 650 (9th Cir.1989), cert. denied, 493 U.S. 1047 (1990). At the bottom level, a police officer may approach and ask questions of an individual in a public place at any time, as long as that individual recognizes that he or she is free to leave. Florida v. Bostick, 501 U.S. 429, 434-35 (1991); Morgan v. Woessner, 997 F.2d 1244, 1252 (9th Cir.1993) cert. dismissed sub nom. Searle v. Morgan, 114 S.Ct. 671 (1994) (citations omitted). These consensual exchanges need not be supported by any suspicion that the individual is engaged in wrongdoing; they are not considered temporary detentions or seizures under the Fourth Amendment. Id. At the middle level, the Government may detain or seize an individual for brief, investigatory purposes. Id. This type of stop must be supported by reasonable suspicion. Id. (citing Terry v. Ohio, 392 U.S. 1, 20-22 (1968). The essential inquiry in determining whether a seizure has occurred is, if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554 (1979).
 
 
 10
 At the top of the structure lies the Government's authority to effect an arrest, but only for probable cause. Ayarza, 874 F.2d at 650. Neither Ramos nor Garcia has asserted that the police lacked probable cause for their arrest. Therefore, that issue is not before us.
 
 
 11
 * Ramos and Garcia cite Florida v. Royer, 460 U.S. 491 (1983), to support their contention that their consent to search was the fruit of an unlawful temporary detention. Their reliance on Royer is misplaced. In Royer, the Supreme Court was confronted with the question whether Mark Royer's consent to search his luggage was the fruit of an unlawful arrest. Id. at 501. The question whether Royer's consent was the fruit of an unlawful temporary detention was not before the Court.
 
 
 12
 The facts presented in this matter are analogous to those before this court in United States v. $25,000 U.S. Currency, 853 F.2d 1501 (9th Cir.1988). In that matter, officers approached Tomasino Cirimele in an airport terminal and identified themselves. Id. at 1503. They asked Cirimele if they could speak to him. Id. After he responded affirmatively, the officers asked to see his identification and his airline ticket. Id. The officers inquired whether he was carrying narcotics. Id. Cirimele responded, "No, just money." Id. He was carrying approximately $25,000. Id. We held in $25,000 U.S. Currency that the appellant was not temporarily detained or seized during this encounter because he was not prevented from leaving and the officers showed no sign of force or aggression. Id. at 1505. They did not raise their voices or display their firearms. Id.
 
 
 13
 Similarly, Ramos and Garcia were not temporarily detained or seized when they were initially approached by the officers. The encounter occurred in a public place. Ramos and Garcia were free to leave. Ramos and Garcia were not told they were the subject of a law enforcement investigation. The officers did not retain their tickets or identification. The officers did not display their weapons, make a show of force, raise their voices, or otherwise restrain Ramos and Garcia. The initial encounter was a consensual exchange which did not implicate the Fourth Amendment. Morgan, 997 F.2d at 1252.
 
 
 14
 Ramos and Garcia allege, without any support from the record, that the "agents fully exploited the men's lack of familiarity with American civil rights and police procedures and their less-than-fluent English language skills." They also maintain that their alienage "fuel[ed] the coercion" which allegedly converted the consensual encounter into a temporary detention. Ramos and Garcia have not advanced any argument nor cited any authority to support their contention that a police conversation with aliens is coercive per se. We decline to adopt such a rule.
 
 B
 
 15
 The district court found that after Agent Pierson asked Garcia if he was in this country legally, the consensual encounter between the officers and Garcia escalated into a "detention," or "custodial stop." The record supports this conclusion. A person who has disclosed to a federal officer that he was born in Mexico, and that he did not have a "green card or visa," would not feel free to leave after being asked if he was in this country legally. See Mendenhall, 446 U.S. at 554 (a person is "seized" under the Fourth Amendment if, in view of all of the facts, a reasonable person would "believe[ ] that he was not free to leave.").
 
 
 16
 We review de novo whether there are sufficient specific articulable facts to support a temporary detention or seizure. United States v. Carrillo, 902 F.2d 1405, 1410-11 (9th Cir.1990). Garcia's temporary detention was lawful because the officers had an articulable suspicion that he had committed a crime or was about to do so. Royer, 460 U.S. at 498. Ramos and Garcia arrived from Los Angeles, a narcotics "source-of-supply city" for the Seattle area. Agent Pierson, who had five years of experience as a DEA agent at the time of the trial, testified that from the moment the defendants got off the train, they were "in a very hurried state, zigzagging in and amongst passengers who had gotten off of the train in front of them." Garcia and Ramos were "turning their heads and looking completely around them, as if looking for someone in the crowd," except that they were "moving too fast in the crowd to actually recognize anybody." Their heads appeared to be "on a continual swivel" and they were "acting nervous." According to Agent Pierson, they "did not look like they were looking for someone to meet them ... [they appeared to be] looking for law enforcement [officers]." Agent Pierson stated that in his experience, Ramos and Garcia's actions were "indicators" that they were drug couriers.
 
 
 17
 After the initial encounter, the officers learned additional facts, which together with their earlier observations, were sufficient to establish reasonable suspicion. The names on the defendants' train tickets did not match the names on their drivers licenses. Although Ramos stated that they were going to meet Mr. Fleischer, he did not have Fleischer's address, nor did he know where they were supposed to meet. While responding to the officers' questions, Ramos acted "very nervous," and he was visibly perspiring. He kept looking "dartingly" at Garcia, who was behaving in the same manner.
 
 
 18
 The Supreme Court has recognized that a trained, experienced police officer is "able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer." Brown v. Texas, 443 U.S. 47, 52 n. 2 (1978) (citations omitted). On the basis of Ramos and Garcia's demeanor after departing the train, and the facts learned by the officers during their brief consensual exchange, there was sufficient evidence to support a reasonable suspicion that Ramos and Garcia were involved in criminal activity. See United States v. Sokolow, 490 U.S. 1, 5 (1989) (finding reasonable suspicion where, inter alia, the defendant came from a source city for illicit drugs, "appeared to be very nervous and was looking all around the waiting area," and was travelling under an alias); see also $25,000 U.S. Currency, 853 F.2d at 1507 (the court can consider whether the defendant was travelling under an assumed name and whether he was able to answer intelligently questions regarding the use of the alias).
 
 
 19
 Additionally, after Garcia admitted that he was a citizen of Mexico, and that he did not have a visa or green card, the officers also had reasonable suspicion to detain him to determine whether he should be turned over to immigration officers because he was not lawfully in this country. See United States v. Rodriguez-Sanchez, 23 F.3d 1488, 1492 (9th Cir.1994) (citing United States v. Brignoni-Ponce, 422 U.S. 873, 881-82 (1975) (reasonable suspicion is sufficient for the border patrol to stop and determine whether aliens are illegally in this country).
 
 III
 
 20
 Garcia separately contends that the district court erred in denying his motion to suppress all of the statements he made, including his consent to search, after he was asked whether he was in this country legally. Garcia maintains that his statements were inadmissible under the Fifth and Sixth Amendments because he had not been advised of his constitutional rights pursuant to Miranda after he was in custody. The district court concluded "there was no detention until the discussion vis-a-vis Mr. Garcia-Solarzano regarding his alienage. And at that point, as to him and him alone, the stop became a custodial stop." (emphasis added). The district court also determined that Miranda was not implicated because the officers' inquiries were not "the types of questions that could be said to be interrogation." We review whether a defendant is in custody for Miranda purposes for clear error. People of the Territory of Guam v. Palomo, 35 F.3d 368, 375 (9th Cir.1994), cert. denied, 115 S.Ct. 750 (1995).
 
 
 21
 Garcia's counsel argues that the court found that Garcia was "in custody" for Miranda purposes. We decline to construe the court's finding that there was a "detention" or "custodial stop" as to Garcia in this manner. In order for the court to have found that Garcia was properly in custody, or lawfully under arrest, the court would have had to conclude that there was probable cause for his arrest. The court did not find that the officers had probable cause to arrest Garcia because he failed to respond to the question whether he was in this country legally. Instead, the court determined that Garcia was merely subjected to a "detention" or "custodial stop." As discussed above, the test for a "detention," or a "custodial stop" is whether the officers had reasonable suspicion to believe that Garcia had committed a crime or was about to do so. After an independent review of the record, we hold that there was ample evidence to support a temporary detention.
 
 
 22
 The procedural protections afforded by Miranda "are triggered only in the event of a custodial interrogation." United States v. Wauneka, 770 F.2d 1434, 1438 (9th Cir.1985). If Garcia was not in custody, the officers were not required to advise him of his Miranda rights. As we stated in United States v. Woods, 720 F.2d 1022 (9th Cir.1983), "[a]ppellants apparently believe that questioning during a lawful temporary detention or seizure of the person is custodial interrogation.... The law of this circuit is to the contrary." Id. at 1029.
 
 
 23
 The Supreme Court has defined custody, for the purposes of applying the Miranda rule, as a " 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (citations omitted). Custody "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 114 S.Ct. 1526, 1529 (1994). As we stated in United States v. Beraun-Panez, 812 F.2d 578 (9th Cir.1987), we employ an objective test in determining whether a person was in custody at the time he or she is questioned because it "avoids imposing upon police officers the often impossible burden of predicting whether the person they question, because of characteristics peculiar to him, believes himself to be restrained." Id. at 581 (citations omitted).
 
 
 24
 We have previously recognized that the following factors should be considered in determining whether a person is in custody:
 
 
 25
 One. The language used by the officers in summoning the person interviewed.
 
 
 26
 Two. The physical characteristics of the place where the interrogation occurred.
 
 
 27
 Three. The degree of pressure applied to detain the individual.
 
 
 28
 Four. The duration of the detention.
 
 
 29
 Five. The extent to which the person was confronted with evidence of his guilt.
 
 
 30
 United States v. Hudgens, 798 F.2d 1234, 1236 (9th Cir.1986). (citing United States v. Booth, 669 F.2d 1231, 1235 (9th Cir.1981)).
 
 
 31
 Applying the factors set forth in Hudgens and Booth, it is clear that Garcia was not in custody for Miranda purposes following his disclosure that he did not have a visa or a green card. The physical status quo was undisturbed. The officers did not use force or draw their guns. Garcia was not handcuffed or told he was not free to leave. After Garcia declined to answer whether he was in this country legally, the officers dropped the subject of his immigration status. The questioning of Garcia continued in a public place. After reviewing Garcia's ticket and identification, the officers returned these documents to him. They did not pressure Garcia to disclose his immigration status. Garcia volunteered the information that he did not have a visa or green card. He was not confronted with any evidence that he was not in this country legally. The entire encounter between Garcia and the officers was brief; it lasted approximately five minutes. These objective facts demonstrate that Garcia's freedom of movement was not restrained after he revealed his immigration status. Accordingly, he was not "in custody" as that term is applied in Miranda jurisprudence after being asked if he was in this country legally. Instead, he was merely subjected to temporary detention because the officers had reasonable suspicion that he was engaged in criminal activity.
 
 
 32
 If, as argued by Garcia, the district court's words were an implicit finding that Garcia was "in custody" for Miranda purposes, after he was asked if he was in the country legally, that finding would be clearly erroneous. As discussed above, however, the court did not find expressly or impliedly that Garcia was "in custody." Instead, it concluded that he was merely subjected to a "detention" or "custodial stop."
 
 
 33
 Because we conclude that Garcia was not in custody for Miranda purposes, we do not reach the question whether Garcia was subjected to interrogation while he was temporarily detained. See Wauneka, 770 F.2d at 1438 (the procedural protections afforded by Miranda "are triggered only in the event of a custodial interrogation."). The district court denied Garcia's motion to suppress his statements because it found that Garcia was not subjected to interrogation. We can affirm the court's denial of Garcia's motion to suppress for failure to advise him of his Miranda rights on any basis supported by the record. United States v. Gonzalez-Roncon, 36 F.3d 859, 866 (9th Cir.1994), cert. denied, 115 S.Ct. 1323 (1995). Because Garcia was not in custody, Agent Pierson was not required to advise him of his Miranda rights. Woods, 720 F.2d at 1029.
 
 IV
 
 34
 Ramos and Garcia also maintain that the district court erred in denying their motion to suppress because their consent to search was involuntary. It is undisputed that Ramos and Garcia gave the officers written and verbal consent to search their luggage. Ramos and Garcia assert, however, that "[t]he fact that the two men would 'consent' to the search of luggage which they knew would reveal the presence of cocaine ... belies any notion that they voluntarily consented."
 
 
 35
 This contention is frivolous. The Supreme Court disposed of a similar argument as follows: "the question is not whether the respondent acted in her ultimate self-interest [in consenting to the search] but whether she acted voluntarily." United States v. Mendenhall, 446 U.S. 544, 559 (1980). The district court did not clearly err in denying Ramos and Garcia's motion to suppress because the record demonstrates that their consent was voluntary.
 
 V
 
 36
 Garcia maintains that the district court erred in denying his motion for judgment of acquittal. By electing to proceed with the presentation of proof on his behalf, Garcia waived his right to challenge the denial of his motion on appeal. United States v. Martinez, 514 F.2d 334, 337 (9th Cir.1975). Because Garcia argues the issue as if it were a challenge to the sufficiency of the evidence, we must determine whether viewing the evidence in the light most favorable to the Government, a "rational trier of fact could have found the elements of the charged offense beyond a reasonable doubt." United States v. Mesa-Farias, 53 F.3d 258, 259 (9th Cir.1995) (citations omitted).
 
 
 37
 "A conviction for possession with intent to distribute narcotics may be based upon one of three legal theories: (1) co-conspirator liability ... (2) aiding and abetting ... and (3) exercising dominion and control over the contraband...." United States v. Sanchez-Mata, 925 F.2d 1166, 1168 (9th Cir.1991) (citations omitted). The indictment alleges that Garcia "knowingly and intentionally did possess, and did aid and abet the possession of, with intent to distribute a quantity of cocaine...." The jury returned a general, not a special verdict. Thus, the record does not demonstrate whether the jury found Garcia guilty as a principal or as an aider or abettor.
 
 
 38
 * Garcia argues that there was insufficient evidence to demonstrate that he knew there was cocaine in the black bag or that he exercised dominion and control over it. To support Garcia's conviction as a principal, the Government must establish that "the defendant both knows of the presence of the contraband and has the power to exercise dominion and control over it." Sanchez-Mata, 925 F.2d at 1169. The Government may demonstrate dominion and control by proof of actual physical custody or "constructive possession." United States v. Castillo, 866 F.2d 1071, 1086 (9th Cir.1989). Constructive possession " 'has been generally defined as knowingly having both the power and intention at a given time to exercise dominion or control over the property.' " United States v. Earl, 27 F.3d 423, 424-25 (9th Cir.1994) (citations omitted).
 
 
 39
 Viewing the evidence in the light most favorable to the Government, we conclude that there was sufficient evidence to establish that Garcia had knowledge of and control over the cocaine. Garcia and Ramos were travelling under aliases. See United States v. Walitwarangkul, 808 F.2d 1352, 1354 (9th Cir.), cert. denied, 481 U.S. 1023 (1987) (using an alias is a factor which supports an inference of knowledge). Garcia's nervous behavior at the Amtrak station was consistent with drug trafficking. The jury could have concluded that Ramos would not have allowed Garcia to accompany him, and certainly would not have allowed Garcia to place his clothing in the black bag, unless Garcia knew about the cocaine. During the search of the black bag, Garcia denied ownership of the stereo speakers. The jury could have inferred that he did so to disassociate himself from the cocaine.
 
 B
 
 40
 Garcia also contends that there was insufficient evidence to establish that he was an aider and abettor in the crime of possession with the intent to distribute. To support the conviction of an accused as an aider and abettor, the Government must show that the defendant participated in a criminal venture and that he intentionally assisted in its illegal purpose. United States v. Vasquez-Chan, 978 F.2d 546, 552 (9th Cir.1992). Garcia's entire argument regarding this issue is contained in the follow sentence: "[t]here is a total absence of evidence that [he] had any knowledge that cocaine was hidden in the stereo speakers, let alone that he intentionally assisted [Ramos] in an illegal venture." As discussed above, there was sufficient evidence to demonstrate that Garcia knew the cocaine was in the black bag and that he intentionally assisted Ramos in transporting it.
 
 VI
 
 41
 Garcia asserts that the district court erroneously denied his request for a four-point reduction due to his "minimal" role in the offense pursuant to section 3B1.2(b) of the United States Sentencing Guidelines. Both Garcia and Ramos received two-point reductions under U.S.S.G. Sec. 3B1.2(a).
 
 
 42
 A district court's finding that a defendant does not qualify for "minimal participant status" is reviewed for clear error. United States v. Davis, 36 F.3d 1424, 1436 (9th Cir.1994), cert. denied, 115 S.Ct. 1147 (1995). The defendant has the burden of demonstrating by a preponderance of the evidence that he is entitled to a reduction under section 3B1.2. Id.
 
 
 43
 Garcia advances two theories to support his assertion that he was a "minimal" participant in the crime. Garcia maintains that he was merely a drug courier who "had a small, isolated and one-time role in the drug trafficking activity." Further, he argues that he was much less culpable than Ramos, who also received a two-point reduction. Neither of Garcia's assertions has merit.
 
 
 44
 A downward adjustment under section 3B1.2 is used infrequently and only in exceptional circumstances. Davis, 36 F.3d at 1436. The fact that a defendant may be "less culpable than other participants in an offense" does not mean that he or she is necessarily "entitled to a minimal or minor role adjustment under section 3B1.2." Id. Further, the fact that the defendant was a drug courier does not "mean that his role was minimal or minor." Id. (citations omitted).
 
 
 45
 Garcia and Ramos were carrying approximately five kilograms of cocaine. A finding that a defendant carried a substantial quantity of illegal drugs "would foreclose a minimal participant adjustment" and could be "relevant to whether a defendant is a minor participant." United States v. Webster, 996 F.2d 209, 212 n. 5 (9th Cir.1993). Given upon the quantity of drugs involved in the offense, the district court did not clearly err in denying Garcia's request for a further reduction under section 3B1.2.
 
 
 46
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3