**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Vidal MORENO, Defendant-Appellee.**

**No. 83–5151.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 7, 1983.

Decided Sept. 10, 1984.

Wallace, Circuit Judge, concurred with opinion.

H. David Schmerin, Rotkin, Schmerin & McIntyre, Los Angeles, Cal., for defendant-appellee.

Christine S. Byrd, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellant.

Before GOODWIN, WALLACE and TANG, Circuit Judges.

TANG, Circuit Judge:

The government appeals from an order granting defendant Moreno's motion to suppress cocaine discovered during an airport detention. We find that the cocaine was discovered as a product of a search conducted in violation of the fourth amendment and affirm the district court's ruling.

## FACTS

The outline of the salient events in this case is not in dispute. However, conflicting evidence was introduced concerning a number of facts. On February 22, 1983, Moreno arrived at Los Angeles International Airport on a nonstop flight originating from Miami, Florida. John Marcello, a Drug Enforcement Agency ("DEA") agent observing passengers disembarking from that flight, noticed that Moreno was not carrying any hand luggage or a camera typical of most arriving passengers. Agent Marcello also noticed that Moreno appeared to focus attention upon two plain clothes Los Angeles Police Department ("LAPD") detectives who were on duty with Marcello as the defendant walked towards the baggage claim area.

Just before Moreno entered the baggage claim area he spoke briefly with an unidentified Latin male. The two men then parted, Moreno going on to the baggage claim area and waiting, while the unidentified male went outside and waited on the sidewalk.

A few minutes later, Moreno took a bag from the baggage carousel and exited the claim area. Agent Marcello testified that the bag had been on the carousel for at least five minutes before Moreno claimed it. Moreno testified that his bag was one of the last ones to come down the carousel ramp, and that explained his long wait in the area.

Agent Marcello then approached Moreno, identified himself as a federal narcotics officer and asked Moreno in English if he would answer a few questions. Marcello testified that Moreno answered him affirmatively in English. Moreno testified that he did not speak English and did not understand what Agent Marcello was saying to him. Agent Marcello testified that he advised Moreno that he did not have to answer the questions if he did not want to.

Through the questioning, Agent Marcello learned that Moreno was Colombian, that he did not have his passport, and that his airline ticket was not in his name. Agent Marcello stated that Moreno handed him his ticket; Moreno, on the other hand, testified that Agent Marcello took it from his hand. Agent Marcello then returned Moreno's ticket and identification to him. This questioning took several minutes.

Agent Marcello testified that he then asked Moreno whether he would accompany him to the DEA office located approximately 75 yards away and that Moreno agreed to do so. Moreno claimed that he did not understand Marcello and that he was physically escorted to the DEA office. Moreno's bag was carried to the office by one of the LAPD detectives working with Agent Marcello.

At the DEA office, Moreno was interrogated by Officer Hamm. After asking Moreno in Spanish the same series of questions Agent Marcello had asked him in English, Officer Hamm asked Moreno, in Spanish, if he would consent to a search of the suitcase. Moreno was told that he did not have to consent. Moreno consented to the search.

After Moreno agreed to the search, his bag was brought into the office. The search revealed approximately one kilogram of cocaine wrapped inside a toy scooter in the suitcase. Moreno was arrested and read his Miranda rights. At least 15 minutes passed from the time of Agent Marcello's initial encounter with Moreno to

when Moreno was told he was under arrest.

Moreno was indicted for possession with intent to distribute 1,164.1 grams of cocaine in violation of 21 U.S.C. § 841(a)(1). Before trial Moreno moved to suppress the cocaine discovered in his suitcase. Following a pretrial hearing the district court granted Moreno's motion to suppress the evidence. The government appeals.

## DISCUSSION

The issue in this case centers on the propriety of the airport detention and subsequent search of Moreno's luggage. The Supreme Court recently was confronted with an airport detention fact pattern, in *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) similar in many respects to the instant case. In *Royer*, the defendant had aroused the suspicions of several narcotics agents stationed at Miami International Airport. The officers believed that Royer's appearance, mannerisms, luggage and actions fit the "drug courier profile".[1] As Royer approached the airline boarding area, two detectives approached him, identified themselves as police officers and asked if Royer would speak to them. *Id.* at 1322. Royer replied in the affirmative. *Id.* The officers' suspicions were heightened when they discovered that defendant's airline ticket and driver's license bore different names. *Id.* The detectives then told Royer that they had reason to suspect him of transporting narcotics and asked him to accompany them to a room adjacent to the concourse. *Id.* Royer did not reply but went with the agents as requested. *Id.* Royer's baggage was brought to the interrogation room and Royer was asked if he would consent to a search of the suitcases. *Id.* Royer did not orally object to the search which revealed a sizeable quantity of marijuana. *Id.*

In assessing the reasonableness of the initial encounter, the *Royer* plurality found

---

**1.** The drug courier profile is an abstract of characteristics found to be typical of persons trans-

porting illegal drugs. *See Royer* at 1322 n. 2.

that when the officers discovered Royer was travelling under an assumed name, this fact and the objective facts previously known to the officers were sufficient grounds for suspecting Royer of carrying narcotics and for temporarily detaining him and his luggage while they endeavored to verify or dispel their suspicions in a manner that did not exceed the limits of an investigative detention.[2] The *Royer* plurality stated that had Royer voluntarily consented to the search of his luggage while he was being detained on reasonable suspicion, the marijuana discovered in the suitcase would have been admissible against him. *Id.* at 1326. However, by the time Royer gave his consent to search the suitcase, the *Royer* court found that the detention had been transformed into a full blown arrest:

> What had begun as a consensual inquiry in a public place had escalated into an investigatory procedure in a police interrogation room, where the police, unsatisfied with previous explanations, sought to confirm their suspicions. The officers had Royer's ticket, they had his identification and they had seized his luggage. Royer was never informed that he was free to board his plane if he so chose, and he reasonably believed that he was being detained. At least as of that moment, any consensual aspects of the encounter had evaporated ... As a practical matter, Royer was under arrest.

*Id.* at 1326–27.

The *Royer* court found that the agents did not have probable cause to support Royer's arrest and upheld the suppression of the narcotics found in Royer's suitcase. *Id.* at 1329.

Several parallels can be drawn between the *Royer* fact pattern and the case before us. Similar to *Royer*, Moreno aroused Agent Marcello's suspicion when he fit certain characteristics of the drug courier profile. And as in *Royer*, Agent Marcello approached Moreno and asked the defendant if he would answer a few questions.

Moreno was also found to be travelling with an airline ticket not in his name. Finally, Moreno too was asked by a narcotics agent to accompany him to an office for further questioning.

In ruling on the suppression motion in the instant case, the district court relied heavily on the *Royer* opinion in its decision to suppress the evidence. Following *Royer*, the district court held that the initial encounter by Agent Marcello for the purpose of questioning Moreno was not violative of the fourth amendment. The district court further found from the evidence presented that Moreno had led the officers to believe that he was willing to answer questions and did provide information concerning his identification.

The district court held, however, that as in *Royer* the initial consensual questioning between Moreno and Agent Marcello had escalated into a detention by the time Moreno arrived at the DEA office. The district court found that when Agent Marcello asked Moreno to accompany him to the DEA office he did not tell Moreno that he was not required to do so. Second, the district court noted that when Moreno was escorted to the office a DEA agent picked up Moreno's bag and retained it while Moreno was being questioned in the office. Third, the district court observed that the fact that Moreno had only a limited command of the English language added measurably to the detentive atmosphere of the office interrogation.

We find that the *Royer* opinion supports the district court's decision. As in *Royer*, the DEA agents never informed Moreno at the office that he was free to leave. Likewise, the DEA agents had control of Moreno's bag during the office questioning. In both cases, the defendants found themselves in a highly detentive environment—in a small room that had been specially designated for police business, alone with several officers who relayed to them that they were suspected of carrying narcotics. *See Royer* at 1327.

---

**2.** This view of the initial encounter was shared by the dissenting members of the *Royer* opinion.

*See Royer* at 1334 (Blackmun, J., dissenting); 1337 (Rehnquist, J., dissenting).

The degree of coercion in the present case is heightened by one further factor. In *Royer*, the defendant was a highly educated, adult, Caucasian male. *Id.* at 1342 (Rehnquist dissenting). However, in the instant case, Vidal Moreno was a Colombian citizen, whose primary language was Spanish. Evidence was introduced at the suppression hearing that Moreno had at best a very limited command of the English language. In *United States v. Mendenhall*, 446 U.S. 544, 558, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980), Justice Stewart, speaking for the Court, noted that the fact that the defendant was young, under educated, female and Black might have induced her to feel unusually threatened by the narcotics officers, who were white males. While not dispositive in *Mendenhall*, Justice Stewart did note that the characteristics of the defendant are "not irrelevant" in determining whether a seizure has occurred for purposes of the fourth amendment. *Id.* (citation omitted). *See also, Florida v. Royer*, 103 S.Ct. at 1334 n. 2, (Powell concurring.)

■ In the present case, Moreno's lack of familiarity with police procedures in this country, his alienage and his limited ability to speak and understand the English language contributed significantly to the quantum of coercion present at the DEA office. The district court considered these additional factors and correctly found that under the totality of the evidence presented in this case Moreno was not free to leave when he agreed to have his bag searched.

■ In sum, following the guidance of *Royer*, we find that by the time Moreno had been escorted to the DEA office he had been effectively arrested. We also agree with the district court that the agents did not possess probable cause to arrest Moreno and thus that his detention was violative of the fourth amendment.

■ Because we find that Moreno was being illegally detained when he consented to the search of his bag, we agree with the district court that his consent was tainted by the illegality and was ineffective to just-

ify the search. *See Royer* at 1329; *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407; 9 L.Ed.2d 441 (1963). The judgment of the district court is accordingly

AFFIRMED.

WALLACE, Circuit Judge, concurring:

I concur, but for reasons somewhat different than the majority's. Clearly the initial questioning of Moreno satisfied the fourth amendment. As the Supreme Court stated in *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (*Royer*):

> law enforcement officers do not violate the Fourth Amendment by merely approaching an individual ... in [a] public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.

The district court found that, although Moreno did not understand English well, he did voluntarily give his name and identification to a Drug Enforcement Administration (DEA) agent when first approached.

The key to this case is whether Moreno voluntarily accompanied the officers. The district court found, in accord with Moreno's testimony, that he did not "free[ly] and voluntar[ily]" consent to accompany the DEA agent to an airport office. In support of this finding, the district court observed that the DEA agent did not tell Moreno he did not have to go to the office, that Moreno did not understand English well, and that the DEA agent knew this because he had another agent ask in Spanish for Moreno's consent to open the suitcase "to make sure that the defendant understood ...." Under these circumstances, the court found that Moreno did not know "that he was free to leave or free to not [accompany the officers]" when the DEA agent asked him to go to the nearby office and another agent picked up his bag and carried it with them.

Were I reviewing de novo this issue of voluntary consent versus whether "a rea-

sonable person would have believed he was not free to leave," *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.), I might reach a different conclusion than the district court. I believe, however, that the fact-bound nature of the issue requires review under the "clearly erroneous" standard of Fed.R.Civ.P. 52(a) as applied to criminal proceedings, *e.g., United States v. Page*, 302 F.2d 81, 85 (9th Cir.1962) (en banc) (reviewing an issue of consent in a criminal case using the "clearly erroneous" standard). Considering the issue a mixed question of law and fact under *United States v. McConney*, 728 F.2d 1195, 1202–04 (9th Cir.1984) (en banc), it remains "essentially factual," *id.* at 1202, *quoting Pullman-Standard v. Swint*, 456 U.S. 273, 288, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982), founded largely "on the application of the fact-finding tribunal's experience with the mainsprings of human conduct," 728 F.2d at 1202, *quoting Commissioner v. Duberstein*, 363 U.S. 278, 289, 80 S.Ct. 1190, 1198, 4 L.Ed.2d 1218 (1960), and similar to the question whether an individual acted "reasonably" in a negligence case, *see* 728 F.2d at 1204; *cf. United States v. Booth*, 669 F.2d 1231, 1236 (9th Cir.1981) (*Booth*) ("testing the reaction of a reasonable person is nearly identical to the standard applied to the issue of negligence"). The "clearly erroneous" standard of review should apply. *See generally, e.g., United States v. Allen*, 699 F.2d 453, 459 (9th Cir.1982) ("clearly erroneous" standard applies to the issue of voluntary consent versus a reasonable person's belief he would not be free to leave in the context of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (*Miranda*)); *Booth*, 669 F.2d at 1235 (same); *id.* at 1235–36 (citing numerous relevant analogies).

I agree with the majority that *Royer* seems persuasive because it involved similar facts. In our case, however, there are also significant differences. The DEA agent did not keep Moreno's ticket nor take his driver's license. The DEA agent did not advise Moreno he was a suspected drug trafficker. Furthermore, Moreno had just arrived in the United States, unlike *Royer*, who was about to depart when encountered by the police, *see* 103 S.Ct. at 1328. These differences lessen the likelihood of a reasonable person in Moreno's situation believing he was not free to decline the DEA agent's request that he go to the DEA's airport office. Only because I must review the district judge's finding under the "clearly erroneous" standard do I believe we should affirm. There was a conflict in the evidence. The district court did not *clearly* err in finding, instead of a voluntary consent, "a mere submission to a claim of lawful authority," *id.* at 1324. This finding leads to a conclusion that Moreno's detention ripened into a violation of the fourth amendment and tainted the discovery of cocaine in his suitcase.

Although I concur in the result, I emphasize that the majority's excursions into a subjective evaluation of Moreno's "lack of familiarity with police procedures in this country, his alienage and his limited ability to speak and understand the English language" improperly confuses the objective reasonable man test. As the Supreme Court recently held on the closely analogous issue of custody for purposes of *Miranda*, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, —— U.S. ——, ——, 104 S.Ct. 3138, 3152, 82 L.Ed.2d 317 (1984), *citing, e.g., People v. P.*, 21 N.Y.2d 1, 9–10, 286 N.Y.S.2d 225, 232, 233 N.E.2d 255, 260 (1967) (objective test does not "place upon the police the burden of anticipating the frailties or idiosyncracies of every person whom they question."). The subjective matter of familiarity with United States police procedures, presumably a result of alienage in the majority's eyes, has no place in a reasonable man test. An inability to speak and understand English may. Certainly the DEA agent in this case could quickly tell that Moreno had difficulty with English and understood Spanish as a native tongue. Including obvious language barriers as a quality of a hypothetical reason-

able man would not burden the police or make unnecessarily subjective the application of a reasonable man test. In this case, a reasonable man in Moreno's situation may therefore mean one who does not have an adequate ability to speak or understand English. I cannot agree, however, with the majority's dictum on alienage and knowledge of police procedures.