UNITED STATES of America,
Plaintiff–Appellee,

v.

Deborah Ann Sonido BARON, aka
Debbie A. Sonido, aka Debra Ann
Sonido, Defendant–Appellant.

No. 87–1169.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 12, 1988.

Decided Oct. 28, 1988.

Michael R. Levine, Federal Public Defender, Honolulu, Hawaii, for defendant-appellant.

Mark Bennett, Asst. U.S. Atty. Honolulu, Hawaii, for plaintiff-appellee.

Before JAMES R. BROWNING, ALARCON and WILLIAM A. NORRIS, Circuit Judges.

WILLIAM A. NORRIS, Circuit Judge:

Debra Baron appeals her conviction of possession with intent to distribute cocaine and conspiracy to do the same. We affirm the conviction but remand for resentencing.

## I

## BACKGROUND

In June, 1986, during a routine inspection, United Parcel Service employees in Miami, Florida discovered roughly 350 grams of cocaine with an estimated street value of $140,000, along with four stuffed animals, in a package. They gave the package to the police, who forwarded it to the DEA. DEA agents replaced most of the cocaine with a cocaine-substitute, dusted the outside of the plastic bag containing the mixture of cocaine and cocaine-substitute with fluorescent powder, and sewed an electronic beeper tracking device into one of the stuffed animals. They then arranged a controlled delivery of the package to the addressee, Joseph Paliafito, at his ice cream shop in Haleiwa, Hawaii, a small village on the north shore of Oahu.

When the package was delivered to Paliafito, he took it to his apartment in a nearby resort complex without opening it. Shortly after he went into his apartment, the beeper signal changed, indicating that the package had been opened. A few minutes later, he emerged from his apartment with a suspicious bulge in the leg of his shorts about the size of the plastic bag containing the cocaine-substitute. He walked to the apartment in the next building shared by appellant Baron and her boyfriend and co-defendant Mark Gilliland. Baron and Gilliland promptly accompanied Paliafito back to his apartment. Ten minutes later, Baron and Gilliland emerged onto the porch outside the apartment and stared at the DEA agent who was sitting in a car in the parking lot watching Paliafito's apartment. Gilliland called to Paliafito, who joined them on the patio and stared at the police. All three then went back into the apartment. Moments later, the electronic transmitter stopped beeping, indicating that it had ceased to function, which suggested to the law enforcement officers that it had been destroyed.

A few minutes later, all three left the apartment. Some agents arrested Paliafito while another went to call in information necessary to obtain a warrant to search the apartment. Meanwhile, Baron and Gilliland were detained for questioning, initially in the parking area and later on the porch outside of Paliafito's apartment. During the detention, they were ordered not to speak to one another or to touch anything. After about 35 minutes of detention, three DEA agents took Baron into a bedroom in Paliafito's apartment and read her the *Mi-*

*randa* warning. The agents then closed the curtains to darken the room and shined a black light on Baron's hands and arms and the front of her blouse, revealing traces of the fluorescent powder on her hands and blouse.

Baron was then formally "arrested" and taken outside the room while Paliafito and Gilliland were tested with the black light. Agents then brought Baron back into the bedroom to shine the black light on her face and in her mouth, which revealed the fluorescent powder on her chin and upper teeth. Next, the agents searched Paliafito's apartment pursuant to the search warrant they had obtained and found loaded guns, drug paraphernalia, and the plastic bags that the cocaine had been shipped in (which had been rinsed out), but not the cocaine-substitute mixture. The agents then searched the apartment shared by Baron and Gilliland, and found a triple beam scale with residue of Mannitol, a substance commonly used for cutting cocaine. They also found address books containing the address of Gilliland's brother, Michael, from whose Miami address the UPS package had been sent.

Baron, Paliafito, and Mark and Michael Gilliland were charged in a three-count indictment with conspiracy, using a communication facility (UPS) to facilitate the distribution of cocaine, and possession of cocaine with intent to distribute. Mark Gilliland and Paliafito pleaded guilty. After a motion to suppress the results of the black light test was denied, Michael Gilliland and Baron were tried together. The jury convicted Michael Gilliland on all counts; Baron was acquitted on the communication facility charge, but was convicted on the conspiracy and possession charges. She appeals, raising a plethora of arguments. She challenges, first, the denial of the suppression motion; second, the admission of certain evidence at trial; third, the sufficiency of the evidence linking her to the cocaine; and last, the sentencing judge's possible reliance on statements in her presentence report which she contends are false. We consider her arguments in that order.

## II

### SUPPRESSION MOTION

Both Baron and the government pursue alternative theories about why the results of the black light test should or should not have been suppressed. On the one hand, Baron contends that the evidence should have been suppressed because it was the fruit of a de facto arrest unsupported by probable cause. In response, the government argues that Baron was not subject to a de facto arrest at the time of the initial black light search, and that, even if she had been, the arrest was supported by probable cause and the black light test was justified as a search incident to a lawful arrest. Alternatively, Baron contends that if she was not under de facto arrest when the black light test was administered, the test was an unlawful search because it was conducted without probable cause and without either a warrant or exigent circumstances. To that line of argument, the government responds that the black light test was not a search within the purview of the Fourth Amendment, and that even if it were, it was proper without a warrant because probable cause and exigent circumstances existed. The first theory requires us to decide the somewhat difficult question whether Baron was arrested or subject only to a *Terry*-stop at the time of the black light examination. The second theory would require us to consider whether a black light examination is a full search within the meaning of the Fourth Amendment, or a slightly lesser search, analogous to the frisk permissible during a *Terry*-stop.

The district court held that Baron was subject to an investigative detention but not an arrest when the first black light test was administered and that the police had reasonable suspicion to detain her but lacked probable cause to arrest her until after the test. The court held that the test results were admissible, however, because the black light test was not a "search" requiring probable cause. We note that the question whether the black light test was a search is a novel question in this

circuit, and that the law on the issue is uncertain.[1] We leave that question for another day, however. We affirm the district court's order denying the suppression motion on the ground that Baron was subject to a de facto arrest rather than an investigative detention at the time the ultraviolet light test was administered, that the arrest was supported by probable cause, and that the test, even if it was a search, was justifiable as a search incident to a lawful arrest.

### A. Arrest

■ There is no "litmus-paper test ... for determining when a seizure exceeds the bounds of an investigative stop." *Florida v. Royer,* 460 U.S. 491, 506, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983) (plurality opinion). In determining whether an investigative detention has ripened into an arrest, we consider the totality of the circumstances.[2] *United States v. Buffington,* 815 F.2d 1292, 1300 (9th Cir.1987); *see United States v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 1574, 84 L.Ed.2d 605 (1985). When assessing the circumstances, we must bear in mind the Supreme Court's admonition that to qualify as a *Terry*-stop, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." 460 U.S. at 500, 103 S.Ct. at 1325. We believe that the detention in this case was too intrusive to satisfy that standard.

The circumstances of this detention go far beyond any that the Supreme Court has sanctioned under the rubric of an investigative detention. The police ordered Baron not to speak or to touch anything. Having thus effectively silenced and immobilized her, they detained her for 35 to 40 minutes.

Finally, after ordering her to move from the public parking area to the porch outside Paliafito's apartment, they ordered her to go into a bedroom, where she found herself alone, behind closed doors and obscured windows, with three male police officers.

Had the police moved Baron to a police station or interrogation room, we would clearly be compelled to hold that she was subject to an arrest. In *Florida v. Royer,* a seminal case spelling out when an investigative detention becomes so intrusive as to constitute a de facto arrest, the Supreme Court found particularly significant the fact that the police moved the suspect from an airport concourse to a DEA interrogation room. 460 U.S. at 504–05, 103 S.Ct. at 1328–29. The Court relied on the same principle in *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), in holding that transporting a suspect to the police station transformed a *Terry*-stop into an arrest. In *Dunaway,* the court emphasized the difference between the brief detention in *Terry,* which, the Court repeatedly observed, occurred "on the street," 442 U.S. at 209, 210, 212, 99 S.Ct. at 2254, 2255, 2256, and a situation in which the police take the suspect into custody for interrogation, *id.* at 209, 211, 212, 214–16, 99 S.Ct. at 2254, 2255, 2256, 2257–59. Under *Dunaway* and *Royer,* a suspect is no less in custody and subject to all the coercion implicit in custodial interrogation if the police move her to a bedroom rather than a police room. We have recognized that a detention becomes significantly more coercive when the police move a suspect from an area open to the public to an enclosed room used for police interrogation. In *United States v. Moreno,* 742 F.2d 532, 535 (9th Cir.1984), for example, we held that suspects were subject to a de

---

1. Two courts have held ultraviolet light tests to be searches within the meaning of the Fourth Amendment. *United States v. Kenaan,* 496 F.2d 181, 182–83 (1st Cir.1974); *People v. Santistevan,* 715 P.2d 792, 794–95 (Colo.), *cert. denied,* 479 U.S. 965, 107 S.Ct. 468, 93 L.Ed.2d 412 (1986). Other courts have held that they are not. *United States v. Richardson,* 388 F.2d 842 (6th Cir.1968); *Williams v. City of Lancaster,* 639 F.Supp. 377, 682 (E.D.Pa.1986); *United States v. DeMarsh,* 360 F.Supp. 132, 137 (E.D. Wis.1973); *United States v. Millen,* 338 F.Supp.

747, 753 (E.D.Wis.1972); *Commonwealth v. De-Witt,* 226 Pa.Super. 372, 314 A.2d 27, 30–31 (1973).

2. The question whether Baron was subject to an investigative detention or a full-scale arrest at the time of the first ultraviolet light test is reviewed de novo. *United States v. Al–Azzawy,* 784 F.2d 890, 891–92 (9th Cir.1985), *cert. denied,* 476 U.S. 1144, 106 S.Ct. 2255, 90 L.Ed.2d 700 (1986).

facto arrest when the police relocated them from the public area of an airport to "a highly detentive environment— ... a small room that had been specially designated for police business, alone with several officers who relayed to them that they were suspected of carrying narcotics." Similarly, in *United States v. Woods*, 720 F.2d 1022, 1027 (9th Cir.1983), we held that a *Terry*-stop became an arrest when the police moved the suspects from an airport cocktail lounge to the police station. *Accord: United States v. Prim*, 698 F.2d 972, 976–77 (9th Cir.1983) (relocating defendant from public area in airport terminal to DEA office 100 yards away held to transform investigative detention into an arrest).

In contrast, we have held that a *Terry*-stop is not transformed into a de facto arrest when a defendant is moved from the street to the back of a police car. *See United States v. Parr*, 843 F.2d 1228, 1231 (9th Cir.1988); *but see United States v. Chamberlin*, 644 F.2d 1262, 1266 (9th Cir. 1980) (20–minute detention in back seat of patrol car held to constitute arrest), *cert. denied*, 453 U.S. 914, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981). Nor is an investigative stop transformed into an arrest merely because the police use force in handling the suspect. *See, e.g., United States v. Buffington*, 815 F.2d 1292, 1300 (9th Cir.1987) (suspects not arrested when ordered to get out of their car and lie down on pavement); *United States v. Jacobs*, 715 F.2d 1343, 1345–46 (9th Cir.1983) (per curiam) (same).[3]

The distinction between *Dunaway* and *Royer*, on the one hand, and *Parr* and *Buffington*, on the other, lies in the fact that when the police move a suspect from an area open to the public to an enclosed room under police control, the circumstances are deemed to be more coercive than the brief public interview authorized by *Terry*

*v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed. 2d 889 (1968). The detention is "qualitatively and quantitatively ... so intrusive with respect to a suspect's freedom of movement and privacy interests as to trigger the full protection of the Fourth ... Amendment[ ]." *Hayes v. Florida*, 470 U.S. 811, 816, 105 S.Ct. 1643, 1646, 84 L.Ed.2d 705 (1985) (taking suspect from his home to police station for fingerprinting is an arrest, even though it was a brief detention and was justified by the legitimate purpose of confirming police suspicion, because it was indistinguishable from an arrest). As Justice Powell observed in his concurring opinion in *United States v. Mendenhall*, detaining a suspect in a public place (in that case, the concourse of an airport) is less intrusive than a detention in a place removed from public view where the suspect is "isolated from assistance." 446 U.S. 544, 563, 100 S.Ct. 1870, 1882, 64 L.Ed.2d 497 (1980) (Powell, J., concurring). Professor LaFave articulated the principle as follows: "the notion seems to be *not* that every entry onto police 'turf' makes any seizure into an arrest, but rather that the circumstances of one's presence there may be sufficiently coercive that no distinction can rightly be drawn between that seizure and an arrest." 3 W. LaFave, *Search and Seizure* § 9.2(g) at 401 (2d ed. 1987) (emphasis in original).

The principles that we distill from these cases are that the police may move a suspect without exceeding the bounds of the *Terry*-stop when it is necessary for safety or security reasons, *see Royer*, 460 U.S. at 504–05, 103 S.Ct. at 1328–29, when it is the least intrusive method available to achieve the legitimate goals of the stop, *id.*, and when moving the suspect does not make the circumstances of the detention so coercive that the detention becomes indis-

---

**3.** The government's reliance on *United States v. Montoya de Hernandez*, 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985), is misplaced. In that case, the Supreme Court upheld a detention lasting 27 hours during which customs officials waited for a suspected alimentary canal smuggler to have a bowel movement expelling balloons containing illegal drugs. That case is inapposite because the detention took place at the border, where Fourth Amendment protections are greatly diminished. Similarly inapposite, because it involved a border search, is *United States v. Moore*, 638 F.2d 1171, 1174–75 (9th Cir.1980) (detention during which police moved defendant from a taxi, to caged back seat of police car, to airport manager's office for questioning by customs officials held to be *Terry*-stop rather than arrest), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 924, 66 L.Ed.2d 842 (1981).

tinguishable from an arrest. *See Sharpe,* 470 U.S. at 684, 105 S.Ct. at 1574 (noting that the holding in *Royer* that the detention was an arrest was based "particularly [on] the fact that the police confined the defendant in a small airport room for questioning"); *see generally* 3 LaFave, *Search and Seizure* § 9.2(g) at 393–401 (2d ed. 1987) (discussing circumstances under which moving a suspect transforms an investigative detention into an arrest). The last consideration—the coerciveness created by isolating a suspect in a private space controlled by the police—is the crucial factor in this case.

The encounter plainly became more coercive than the usual *Terry*-stop when the police took Baron into the bedroom and closed the curtains. A young woman shut into a darkened bedroom with three male police officers would doubtless feel a great deal more threatened than if she were standing on the street, or even sitting in the back of a patrol car in public. Isolated alone in a bedroom with police officers, she is likely to feel helpless and at their mercy. We recognized this in *United States v. Moreno.* In that case, as in *Royer,* the defendant was confined alone with several police officers. 742 F.2d at 536. We found the coerciveness in *Moreno* "heightened by one further factor," which was that unlike Royer, who was an educated, Caucasian adult male, Moreno was a Colombian citizen whose primary language was Spanish. *Id.* The disparity of power implicit in the ethnic differences in *Moreno* is similar to the disparity of power stemming from the gender differences here. In finding the difference of ethnicity significant in *Moreno,* we relied on the Supreme Court's opinion in *Mendenhall,* which noted that the fact that the defendant was a young, uneducated, Black female might have induced her to feel especially threatened by police,

who were white males. 742 F.2d at 536 (citing 446 U.S. at 558, 100 S.Ct. at 1879). That the police took Debra Baron to a darkened bedroom in a private residence to conduct a black light test rather than to a police office or station-house does not make the detention any the less daunting. Indeed, it may have made it more so.

In sum, we have a situation where the police, after detaining Baron for 35–40 minutes under an order not to speak to anyone or to touch anything, separated her from her companion, and took her alone into a darkened bedroom for purposes of conducting an investigation. The coerciveness in the totality of these circumstances is so great that we cannot distinguish this detention from a full-scale arrest.[4] We therefore hold that the police effectively arrested Baron for Fourth Amendment purposes when they took her into the bedroom of Paliafito's apartment.

### B. *Probable Cause*

■ Having determined that Baron was arrested, we next consider whether the arrest was supported by probable cause. The district court found that there was no probable cause "initially" (presumably the district court meant until after the first black light test revealed fluorescent powder on Baron that gave the police probable cause to believe she was involved in the conspiracy). The government challenges this determination.[5]

Probable cause to support a warrantless arrest exists if, at the time of the arrest, the police know sufficient facts to lead a prudent person to believe that the suspect has committed or is committing a crime. *United States v. Smith,* 790 F.2d 789, 792 (9th Cir.1986). "'In order to find probable cause based on association with persons

---

4. *United States v. Vanichromanee,* 742 F.2d 340, 345 (7th Cir.1984), is not to the contrary. In that case, the Seventh Circuit held that moving three suspects from an apartment building parking garage to the apartment belonging to one of the suspects did not transform the stop into an arrest. The suspects there were not isolated from one another, but rather were permitted to sit together in the living room and to smoke. *Id.* at 343. That is a far cry from isolating a

female suspect alone in a darkened bedroom with three male police officers.

5. The probable cause determination is a mixed question of law and fact in which the legal issues predominate, and so is reviewed de novo. *United States v. Smith,* 790 F.2d 789, 791 (9th Cir.1986).

engaged in criminal activity, some additional circumstances from which it is reasonable to infer participation in the criminal enterprise must be shown. One important consideration in assessing the significance of the association is *whether the known criminal activity was contemporaneous with the association.*'" *United States v. Howard,* 758 F.2d 1318, 1320 (9th Cir.1985) (per curiam) (quoting *United States v. Hillison,* 733 F.2d 692, 697 (9th Cir.1984)) (citations omitted and emphasis added in *Howard*).

Before taking Baron into the bedroom to administer the black light test—her arrest—the DEA knew the following: They had seen her two days previously leaving Paliafito's ice cream shop with Mark Gilliland; Paliafito had gone from the ice cream shop to his apartment immediately after the package was delivered and then promptly to her apartment after opening it; she was with Gilliland when he apparently recognized the officers watching Paliafito's apartment and alerted Paliafito to the fact that they were being watched; and she was in Paliafito's apartment when the beeper suddenly stopped transmitting, which was right after they apparently realized they were under the watchful eye of the police. Baron contends that these facts are as consistent with her being an innocent bystander—the girlfriend of one conspirator and the neighbor of another—as they are with her being involved in the crime. In support of this characterization of her situation, she notes the proposition stated in *Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause...." *Id.* at 91, 100 S.Ct. at 342.

Although it is a close question, we believe that these facts would lead a prudent person to believe that Baron was probably involved in an illegal conspiracy to possess and distribute the cocaine. The officers had seen Baron associating with Paliafito and Gilliland under circumstances in which she must have known that they were discussing the cocaine and the police surveillance. It is unlikely that Paliafito and Gilli-

land would have revealed to her that Paliafito had just received a large amount of cocaine or would have destroyed the electronic transmitter in her presence if she were as naive as she claims. As we have noted, in finding probable cause based on association with persons engaged in criminal activity, a significant consideration "is whether the nature of the criminal activity is such that it could not normally be carried on without the knowledge of all persons present." *Hillison,* 733 F.2d at 697. We believe that the criminal activity in this case is of that nature. We therefore hold that the police had probable cause to arrest her at the time they took her into the bedroom of Paliafito's apartment. Accordingly, the de facto arrest that occurred was lawful.

## C. *Search Incident to an Arrest*

■ The government contends, and the district court agreed, that the black light test of Baron's hands and shirt was not a search within the meaning of the Fourth Amendment. Baron challenges this determination. As we have noted above, *see supra* at 914 & n. 1, the issue is a difficult one on which courts disagree. We need not decide whether the black light test constituted a search within the meaning of the Fourth Amendment, however, because even assuming it was a search, we uphold the district court's denial of the suppression motion on the ground that the evidence revealed in the black light test was admissible as the fruit of a search incident to an arrest. *See Smith,* 790 F.2d at 792 (when reviewing a motion to suppress, the court may affirm on any ground fairly supported by the record).

Police may conduct a full search of a person subject to a custodial arrest without either a warrant or probable cause to believe that the search will produce evidence of a crime. *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) (upholding search of arrestee's pocket and rejecting argument that scope of search incident to arrest must be limited to places where police suspect they might find evidence or a weapon); *Gustafson v. Flor-*

*ida,* 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973) (same). "It is the fact of the lawful arrest which establishes the authority to search, and ... in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment." *Robinson,* 414 U.S. at 235, 94 S.Ct. at 477. A full search of an arrested person is permissible, subject only to the limitation that the search not be "extreme or patently abusive." *Id.* at 236, 94 S.Ct. at 477 (citing *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952)). The ultraviolet light test was neither extreme nor patently abusive. Therefore, assuming, without deciding, the black light test was a search within the meaning of the Fourth Amendment, we believe it was a legitimate search incident to an arrest. Accordingly, we affirm the district court's order denying Baron's motion to suppress.

### III

### EVIDENCE OF OTHER CRIMES

■ Baron contends that the trial court erred in refusing to strike testimony in which a DEA agent referred to evidence found in a search of Paliafito's apartment that suggested the defendants were involved in large-scale sales of marijuana.[6]

The testimony at issue was that of a DEA agent who found plastic bags in Paliafito's apartment that he described as having "an odor of marijuana about them; and my experience as a narcotics investigator, large quantities...." Reporter's Transcript ("R.T.") at 84. Defense counsel promptly moved to strike the testimony, but the motion was denied. The witness then continued: "And, in my experience as a narcotics investigator, when I come across large quantities and even what is referred to as $20 bags of marijuana, they have been in this same type of plastic and heat seal." *Id.* Defense counsel understandably objected to this gratuitous reference to other crimes; the district court had ruled before trial that evidence of the mari-

juana-related items found in Paliafito's apartment, if admissible at all, would be limited to rebuttal. Yet, this testimony was given on direct examination.

Admission of the evidence does not, however, require reversal. Even if the district court erred in declining to strike the testimony, any error was more probably than not harmless. *See United States v. Owens,* 789 F.2d 750, 757 (9th Cir.1986) (harmless error standard applies to nonconstitutional error in the admission of testimony), *rev'd on other grounds,* —— U.S. ——, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988). The comment was a brief passing reference made in the course of two days' worth of government evidence. Moreover, it was not directly prejudicial to Baron in that it was not evidence of past crimes that *she* had committed. At most it showed that she associated with someone who may have dealt in large quantities of marijuana. That was hardly surprising news to the jury, given that the defense stated in opening argument that it would not dispute much of the government's evidence. The theory of the defense was that Baron's only guilt was by association: "the only thing Debra is guilty of is a poor choice in a boy-friend and a poor choice in a neighbor." R.T. at 27. That the evidence did not tarnish the defense theory is underscored by defense counsel's concession during closing statement that "Apparently Mr. Paliafito was dealing in drugs. He had all the accoutrements of a drug dealer. He had guns. He had all these tools. He had plastic bags." R.T. at 396. Defense counsel simply reiterated the theory that Debra Baron was merely a naive neighbor who should not have befriended such an unsavory person as Paliafito. In light of these circumstances, the evidence of Paliafito's possible involvement with marijuana dealing was more probably than not harmless.

### IV

### SUFFICIENCY OF THE EVIDENCE

■ Baron next challenges the sufficiency of the evidence to support her convictions of both conspiracy and possession.

---

6. Trial court decisions regarding admission of evidence of other crimes are reviewed for abuse

of discretion. *United States v. Feldman,* 788 F.2d 544, 557 (9th Cir.1986).

To obtain a conviction for conspiracy, the government must first prove the existence of a conspiracy. *United States v. Penagos*, 823 F.2d 346, 348 (9th Cir.1987). Once the existence of the conspiracy is shown, and Baron does not dispute that it was shown here, the government need only prove a "slight" connection between the defendant and the conspiracy. *Id.* As to the possession charge, the government must prove that the defendant knew contraband was present and was "capable of exercising dominion and control over the contraband." *Id.* at 350.

Baron contends that the evidence is not sufficient for a rational trier of fact to find beyond a reasonable doubt that she was more than a bystander, who neither knowingly participated in the conspiracy nor exercised the requisite dominion and control over the cocaine/cocaine-substitute to establish possession. She asserts that her association with Gilliland and Paliafito could be innocent, and that the calls between her phone and Michael Gilliland's Florida number could have been made by Mark. Similarly, she suggests her possession of an express mail receipt in her handwriting for a package mailed to Michael shortly before the package in question was sent to Paliafito could be evidence only that she had sent something to her boyfriend's brother, not, as the government portrayed it, that she sent payment for the 350 grams of cocaine that he sent to Paliafito four days later. Further, Baron argues that the fluorescent powder on her hands, blouse and teeth could have been transferred by casual contact with Gilliland, Paliafito, table tops, or door knobs. The jury could, however, find from the evidence as a whole that she was involved in procuring the cocaine, and that she had touched the package and rubbed her finger on her upper gums (the common way to tell whether a substance is in fact cocaine). Moreover, the jury also heard evidence that the plastic bags in which the cocaine had been shipped were found empty and wet in a wastebasket, indicating that they had been rinsed out after the cocaine/cocaine-substitute was dumped. Additionally, the jury could infer from the fact that Baron had fluorescent powder only on the outside of her hands that she had washed out the plastic bags and in doing so had washed off most of the fluorescent powder.

In sum, the case against Baron, viewed in the light most favorable to the government, was more than merely evidence of guilt by association. *Compare Penagos*, 823 F.2d at 349–51 (insufficient evidence to support conspiracy and possession convictions where no evidence that defendant was more than simply present at one of three occasions when drugs were delivered, that defendant touched cocaine, or that defendant owned or leased any of the apartments or cars where cocaine was found). The evidence suffices to support her conviction of conspiracy and possession.

## V

## SENTENCING

■ Finally, Baron requests a remand for resentencing. Fed.R.Crim.P. 32(c)(3)(A) requires the sentencing court to permit the defense to read and comment on the presentence report prior to sentencing. If the defense alleges that the report contains factual inaccuracy, the court must make either a finding on the contested point or a determination that no such finding is necessary and must append any findings it makes to the presentence report. Fed.R. Crim.P. 32(c)(3)(D); *United States v. Edwards*, 800 F.2d 878, 881 (9th Cir.1986). "The purpose of Rule 32(c)(3)(D) is to ensure that a record is made as to the resolution of the controverted matters and to ensure that the resolution of those controversies comes to the attention of the agencies [such as prison and parole agencies] who utilize the presentence report." *United States v. Travis*, 735 F.2d 1129, 1132 (9th Cir.1984). "[S]trict compliance" with the rule is required, and "failure to comply must result in remand" even when it is only questionable whether the trial court may have relied on contested items in the presentence report. *United States v. Petitto*, 767 F.2d 607, 610 (9th Cir.1985); *see also Travis*, 735 F.2d at 1132–33.

After reviewing the presentence report, Baron challenged the veracity of statements allegedly made by Paliafito regarding her involvement in the cocaine conspir-

acy and statements made by her estranged husband regarding her sales of cocaine. In response, the district court stated that:

I'm not going to rely on them as being true. I have no basis for believing it to be true. I see a marriage which is dissolved; the husband, whatever, had reason to say what he wanted to say about someone, and it is not contested. There is a child involved. Any number of things. I have no reason, as I say, to believe any of these Defendants with regard to their accusations against each other, necessarily, *except when you put all the pieces together, you can find some parts to be more believable than other parts.*

Transcript of Sentencing Hearing at 10–11 (emphasis supplied by Baron). Baron contends that the underscored parts of the district court's comments show ambiguity about whether the court in fact relied on her estranged husband's and Paliafito's statements. The district court did, however, append to the presentence report a copy of the sentencing hearing transcript containing defense counsel's objections to Paliafito's and Michael Baron's statements. Although the court's statement that it was "not going to rely on [the challenged statements] as being true" suggests that it did not rely on them, the court's subsequent ambiguous remarks undermine our confidence that the court strictly adhered to the requirements of Fed.R.Crim.P. 32(c)(3)(D). Thus, this case differs from *United States v. Ibarra,* 737 F.2d 825, 827 (9th Cir.1984). In *Ibarra,* the defense objected to inclusion in a presentence report one law enforcement agent's statement that the defendant had bought a gun in order to intimidate other people and another agent's statement that the defendant extorted money. With respect to the first statement, the sentencing judge responded, "What difference does it make what she [the agent] concluded? Anyone can conclude anything they want," and with respect to the accusation of extortion, the judge commented, "One says he [Ibarra] did. One says he didn't. That's all it is". *Id.* at 827. We held that the sentencing judge's remarks showed that the court did not rely on the challenged statements. *Id.* Here, however,

the court was not so explicit. Moreover, it permitted the prosecutor to argue at some length in sentencing that the statements made by Paliafito and Michael Baron were relevant to the sentencing decision. If the court had not intended to rely on those statements, it presumably would have cut the prosecutor off, rather than listening to argument about the relevance of the challenged statements. Because on this record we are not satisfied that the district court did not rely on the statements, we remand for resentencing in compliance with the strictures of Fed.R.Crim.P. 32(c)(3)(D).

The judgment of conviction is AFFIRMED. The sentence is VACATED and the matter is REMANDED to the district court for resentencing.