UNITED STATES of America, Plaintiff,

v.

Kyubum YOON, Defendant.

No. 89–01232 ACK.

United States District Court,
D. Hawaii.

Nov. 7, 1989.

Daniel A. Bent, Stu Gasner, Asst. U.S. Atty., Honolulu, Hawaii, for plaintiff.

Reginald P. Minn, Honolulu, Hawaii, for defendant.

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

KAY, District Judge.

The defendant Kyubum Yoon ("Yoon") has moved to suppress certain evidence seized from him on the evening of August 16, 1989. A hearing on his motion was held on October 30, 1989. The defendant was present, and represented by counsel. The United States presented the testimony of Drug Enforcement Administration Special Agent Richard Kempshall ("Agent Kempshall"), who was cross-examined by defense counsel. The United States also introduced into evidence, without objection, the search warrant affidavit; the notebook found on the front seat of Mr. Yoon's car at the time of his arrest; and the envelope found inside the notebook, which was found to contain a quantity of crystal methamphetamine.

Based on the evidence presented at the hearing, the Court's own examination of the real evidence, and the arguments of counsel, the Court hereby issues its findings of fact and conclusions of law disposing of the motion.

## FINDINGS OF FACT

1. On August 16, 1989, agents of the Drug Enforcement Administration ("DEA") were waiting outside an apartment building located at 1571 Piikoi Street, preparing to execute a search warrant on the residence of Il Hwan Kim and Kuk Hui Dunfee.

2. The Kim/Dunfee apartment building had been under surveillance since June 1989. In that time period, DEA agents had observed conduct establishing probable cause to believe that a substantial crystal methamphetamine distribution operation was being conducted out of the Kim/Dunfee apartment. The DEA agents set forth the facts concerning the investigation in an affidavit presented to Magistrate Bert M. Tokairin, a copy of which is attached hereto as Exhibit 1. On August 16, 1989, the Magistrate determined that probable cause to search the apartment existed, and issued the search warrant.

3. The investigation of Kim and Dunfee developed a great deal of information concerning drug trafficking at the apartment which was known to the DEA agents prior to the search of defendant Yoon. Of particular relevance here, both the surveillance agents and several other witnesses, including the apartment manager, had observed a distinctive pattern of visitation to the Kim/Dunfee apartment: cars would pull up to the front of the building, and remain parked while someone went up to the apartment, stayed for a brief period of time and immediately came back down. License checks were done, which revealed that

many of the cars were registered to persons with criminal records of drug dealing. The visits were predominantly in the evening hours. Conversations that were overheard or otherwise made known to the surveillance agents revealed expressly that these visits were for the purpose of purchasing "ice," or crystal methamphetamine.

4. As noted above, on August 16, 1989, the DEA agents were waiting to execute a search warrant on the Kim/Dunfee apartment. Because the close of the investigation was imminent, the DEA agents decided that they could, if appropriate, take action against the various crystal methamphetamine customers that were continuing to visit the Kim/Dunfee apartment. Prior to this time, of course, the agents could not take action without jeopardizing the investigation. With the search of the Kim/Dunfee apartment to occur that very night, however, action could be taken without word getting back to the main targets.

5. The surveillance of the Kim/Dunfee apartment started at approximately 6:00 p.m. on August 16. At approximately 6:40 p.m., a Korean male, subsequently identified as Justine Seoung Cheol Noh, arrived at the apartment building, went up to the Kim/Dunfee apartment, and returned to his car 15 minutes later. The behavior matched that of the profile the agents had observed over the course of the investigation. They stopped Noh in traffic near Keeaumoku Street, and recovered approximately one-half gram of crystal methamphetamine from Noh's wallet found on the right-hand passenger seat of his car. Noh was arrested for a violation of 21 U.S.C. § 841.

6. At 7:15 p.m., defendant Yoon entered the picture. As had Noh and the many crystal meth customers the agents had observed, Yoon drove up to the apartment building, went up to the Kim/Dunfee apartment, stayed approximately 10 minutes, and promptly left. Yoon displayed exactly the same profile that formed the basis to obtain the warrant to search the apartment, and which had resulted in a successful recovery of crystal meth from Noh only minutes before. Indeed, Yoon's visit was even shorter than Noh's, and even more indicative of a drug transaction.

7. Based on their surveillance of the apartment and the familiarity with the pattern of drug dealing activity that was transpiring at the apartment, the agents decided to stop Yoon. DEA Richard Kempshall, who testified at the suppression hearing, has approximately 18 years experience as a drug enforcement agent. He testified, and the Court so finds based on his expertise, that Yoon's behavior, considered in light of the other information the DEA agents had (as set forth in the search warrant affidavit), was indicative that a drug transaction had just taken place.

8. DEA agents Kempshall and Honolulu Police Department and DEA Joint Task Force Agent Edward Howard approached Yoon's vehicle at the intersection of Lunalilo Street and Pensacola Street while the vehicle was stopped at a red light. Agent Kempshall opened the car door, and instructed Yoon to get out of the car. At that time, and for the reasons discussed below, Agent Kempshall had a pistol drawn.

9. When Yoon got out of the car, Agent Kempshall handed him off to Officer Howard, who frisked Yoon against his car. While the frisk was being completed, Agent Kempshall leaned into the car and immediately noticed what appeared to him to be a leather men's purse on the right front passenger's seat. When he touched the object, he realized that it was black, vinyl, three-ring notebook, measuring approximately 9 inches long, 7 and one-half inches wide, and two inches thick, large enough to contain a handgun. However, because the binding of the notebook was facing him, he could not tell what the notebook contained, and he turned open the cover.

10. Tucked in the inside left flap of the notebook, Agent Kempshall saw the top of a white letter-sized envelope, folded in half along its length. A bulge was visible (without removing the envelope) at the bottom. Scotch tape that had been placed across portions of the envelope and along

some of its seams for reinforcement was also in plain view. Agent Kempshall immediately recognized the folded-over envelope as the way crystal methamphetamine is frequently carried: the bulge in plain view at the bottom of the envelope confirmed his belief that the package contained narcotics, as did the presence of scotch tape along some of the seams, which is frequently used by carriers of crystal methamphetamine to stop the smaller pieces of drug from escaping.

11. Agent Kempshall then removed the envelope from the notebook flap. He immediately noticed that the bulge at the bottom of the envelope was lumpy, further confirming his belief that the envelope contained granules or "rocks" of crystal methamphetamine in varying sizes. The flap to the envelope was not sealed or taped; only some of the edges of the envelope were taped. Agent Kempshall then looked inside the open envelope, and discovered what he perceived to be, based upon his eighteen years of experience, approximately one-half ounce of crystal methamphetamine.

12. Upon finding the drugs, Agent Kempshall leaned back out of the car, and advised Yoon that he was under arrest.

13. Agent Kempshall's purpose in searching the front seat of the car was to search for weapons. His concern that weapons might be found in the car was entirely reasonable. Agent Kempshall had been participating in an investigation of crystal methamphetamine dealing in the Honolulu area since January 1989, and the investigation had revealed that the groups involved in crystal methamphetamine deals are frequently heavily armed, and frequently carry handguns and other weapons in their cars. The stop of Yoon's vehicle was effected in heavy traffic. Agent Kempshall and Officer Howard were appropriately concerned for their own safety, and the safety of other citizens in the area, and the fact that Agent Kempshall had his gun drawn when ordering Yoon out of the car was appropriate under the circumstances.

14. The entire sequence of events from the time Agent Kempshall told Yoon to get out of his car to the time he advised him he was under arrest took between 30 and 60 seconds. Although other officers arrived on the scene shortly thereafter, Yoon was already under arrest at that time.

## CONCLUSIONS OF LAW

### THE DETENTION OF YOON WAS A PROPER TERRY STOP, COUPLED WITH A PROTECTIVE SEARCH OF THE PASSENGER SEAT

█ The DEA agents had "reasonable suspicion," based upon specific and articulable facts which, taken together with rational inferences therefrom, were sufficient for a reasonable law enforcement officer of their experience to conclude that criminal activity may be afoot and that Yoon may be armed and presently dangerous, thereby warranting a *Terry*-stop. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). As part of such a *Terry*-stop, the officers were entitled to search for weapons in the passenger compartment of Yoon's automobile. This issue was squarely addressed by the United States Supreme Court in *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). As the Court emphasized in that case, "investigative detentions involving suspects in vehicles are especially fraught with danger to police officers." *Id.* at 1047, 103 S.Ct. at 3480. A firearm on the passenger seat would have been accessible with a quick lunge from where Mr. Yoon was being frisked. As the Supreme Court explained in *Michigan v. Long*,

> "Just as a *Terry* suspect on the street may, despite being under the brief control of a police officer, reach into his clothing and retrieve a weapon, so might a *Terry* suspect in [defendant's] position break away from police control and retrieve a weapon from his automobile." *Id.* at 1051, 103 S.Ct. at 3482.

If the protective search reveals contraband rather than weapons, the contraband still is not subject to suppression. *Id.* at 1050, 103 S.Ct. at 3481 (no suppression of marijuana

found in leather pouch which "could have contained a weapon.")

■ The facts revealed at the suppression hearing are consistent with a finding that this was a *Terry* stop that later matured into an arrest. The defendant's liberty was completely restrained for only a short period of time prior to his arrest, a key indicia of a *Terry* stop. From the time the defendant was ordered to get out of his car to the time the drugs were discovered involved only 30 to 60 seconds. The stop was on a public thoroughfare; the defendant remained by the side of his vehicle. *Compare United States v. Baron,* 860 F.2d 911, 914 (9th Cir.1988) (suspect moved to enclosed room for questioning). In concert with established authority, whereby panels of the United States Court of Appeals for the Ninth Circuit have found detentions to be *Terry* stops, rather than formal arrests in a wide variety of circumstances, even where there were displays of force and a complete deprivation of the suspect's liberty, *see, e.g., United States v. Greene,* 783 F.2d 1364, 1368 (9th Cir.), *cert. denied,* 476 U.S. 1185, 106 S.Ct. 2923, 91 L.Ed.2d 551 (1986); *United States v. Bautista,* 684 F.2d 1286, 1289 (9th Cir.1982); *United States v. Patterson,* 648 F.2d 625, 632 (9th Cir.1981), this Court concludes that the detention of Yoon did not mature into an arrest until after discovery of contraband incident to the carefully limited search of the passenger compartment of the subject vehicle in an attempt to discover weapons as a reasonable step by the DEA agent to protect himself and the citizenry.[1]

The fact that Agent Kempshall's weapon was drawn when the defendant was ordered to get out of his car did not necessarily transform the *Terry* stop into an arrest. It is well-established that law enforcement officers may display their weapons in making a *Terry* stop if the circumstances so justify. *See e.g., United States v. Buffington,* 815 F.2d 1292, 1300 (9th Cir.1987) (no arrest when defendants forced from their car and made to lie down on pavement at gunpoint); *United States v. Jacobs,* 715 F.2d 1343, 1345–46 (9th Cir.1982) (per curiam) (no arrest when suspect removed from car at gunpoint and order to "prone out" on ground).

Here, the officers had ample information that persons involved in this particular crystal methamphetamine operation were likely to be armed. The Kim/Dunfee investigation was part of a broader Task Force investigation of crystal methamphetamine dealing in Hawaii. Arrests of other members of the network involved in the investigation revealed the widespread possession and use of weaponry, especially in automobiles. Frequently these weapons were found in the possession of users of crystal methamphetamine, who are subject to paranoia and rash violent action. Under these circumstances, it would have been foolhardy for the officers involved in the stop *not* to have been prepared for a potentially violent counter-attack.

■ Given that the *Terry* stop was proper, the search of the passenger seat of the automobile was proper under *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). Agent Kempshall was entitled to open the notebook to see if

1. Even if the arrest had occurred at the time the DEA agents ordered Yoon out of his car at gunpoint, this Court concludes that the DEA agents had probable cause at that time based upon the facts and circumstances within their knowledge sufficient to warrant a prudent man to believe that Yoon had committed a crime. *United States v. Greene,* 783 F.2d 1364, 1367 (9th Cir.1986). In light of the search warrant for the Kim/Dunfee apartment, the pattern of short visits to that apartment by known drug dealers, and the crystal methamphetamine discovered in the possession of Mr. Noh only minutes earlier, it was reasonable for a prudent agent to believe that Yoon, upon displaying the suspect pattern of behavior, had committed some form of transaction in a controlled substance. This was not, as in *United States v. Robertson,* 833 F.2d 777 (9th Cir.1987), a situation where an individual was "merely present" at the site of a drug operation. Yoon engaged in all the behavior that had marked the activities of drug dealers observed at the Kim/Dunfee apartment and exhibited by Mr. Noh only minutes earlier. Under *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), therefore, the search of Yoon's automobile, as well as any containers found therein, was lawful as incident to Yoon's arrest.

it contained a weapon pursuant to *Michigan v. Long.* Once he had done so, he could not be required to close his eyes to the bulging envelope in plain view inside. The folded envelope with scotch tape across portions of it and along some of the seams bore distinctive marks of drug trafficking, as was obvious to Agent Kempshall based on his 18 years of experience. This was not unlike seeing a heat-sealed clear plastic bag protruding from the flap with a bulge at its bottom, or seeing an opaque balloon knotted at its top protruding from the flap with a bulge at its bottom, analogous to the situation in *Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). Kempshall discovered the unsealed envelope in plain view, and perceived by sight that it contained contraband. As with the leather pouch of marijuana at issue in *Michigan v. Long*, the contraband was discovered in the course of a legitimate protective search that was a proper part of the *Terry* stop, and need not be suppressed.

That the Fourth Amendment permits a law enforcement officer to seize a container, such as an envelope, that he has probable cause to believe contains contraband was established by the United States Supreme Court in *Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983), *quoting and explicitly affirming, Payton v. New York*, 445 U.S. 573, 587, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980) ("[t]he seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.")

■ In *Texas v. Brown*, the defendant was legally detained pursuant to a routine driver's license checkpoint. When the Fort Worth police officer requested to see the defendant's driver's license, the officer observed the defendant withdraw his hand from his pants pocket. The officer further observed, between the defendant's two middle fingers, an opaque, green party balloon, knotted about one-half inch from the tip, which the defendant let fall to the driver's seat. The officer testified that based upon his previous experience in arresting individuals suspected of drug offenses, he knew that narcotics are frequently packaged in balloons similar to the one he observed in the defendant's hand. When the defendant opened the glove compartment in order to search for his driver's license, the officer also noticed several small plastic vials, some loose white powder, and an open bag of party balloons. It is significant that the Court did not uphold admissibility of the contents of the balloon based upon the officer's observation of the objects in the glove compartment. The officer's probable cause to believe that the balloon contained contraband was upheld based upon his professional experience that narcotics are frequently transported in opaque party balloons. After the defendant obeyed the officer's order to exit the vehicle, the officer reached into the automobile and retrieved the opaque green balloon. The officer then placed the defendant under arrest.

The Supreme Court held that the balloon, which was later discovered to contain heroin, was admissible in evidence against the defendant on the State's narcotics charges. In so holding, the Supreme Court adopted the "plain view" doctrine as articulated by the Court in *Coolidge v. New Hampshire*, 403 U.S. 443, 465–68, 470, 91 S.Ct. 2022, 2037–39, 2040, 29 L.Ed.2d 564 (1971). According to the plain view doctrine, a warrantless seizure of private property is Constitutionally permissible where the following three requirements are met:

> First, the police officer must lawfully make an "initial intrusion" or otherwise properly be in a position from which he can view a particular area. (cite) Second, the officer must discover incriminating evidence "inadvertently," which is to say, he may not "know in advance the location of [certain] evidence and intend to seize it," relying on the plain-view doctrine only as a pretext. (cite) Finally, it must be "immediately apparent" to the police that the items they observe may be evidence of a crime, contraband, or otherwise subject to seizure. *Texas v. Brown*, 460 U.S. at 736–37, 103 S.Ct. at 1540–41.

In *Texas v. Brown*, the Supreme Court reiterated the following rule as regards warrantless seizures:

> [O]ur decisions have come to reflect the rule that if, while lawfully engaged in an activity in a particular place, police officers perceive a suspicious object, they may seize it immediately. *Id.* at 739, 103 S.Ct. at 1542.

Moreover, the Court explained that the "immediately apparent" language of the "plain view" doctrine does not require that the law enforcement officer must "know" that a seized item constitutes either contraband or evidence of a crime. *Texas v. Brown*, 460 U.S. at 741, 103 S.Ct. at 1542–43. All that is required is that the officer have "probable cause to associate the property with criminal activity." *Id.* at 741–42, 103 S.Ct. at 1543. The Court provided the following definition of probable cause within the context of a warrantless seizure:

> [P]robable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief," (cite) that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A "practical, nontechnical" probability that incriminating evidence is involved is all that is required. *Id.* at 742, 103 S.Ct. at 1543.

It is apparent that the DEA agent in the instant case possessed probable cause to believe that the folded white envelope with the conspicuous cellophane tape across portions of it and along some of the envelope's seams contained an illicit substance. The agent testified that he was aware from his participation in previous narcotics arrests that envelopes taped and folded in the manner of the one possessed by Defendant were frequently used to transport narcotics. Under almost identical facts and circumstances, the *Texas v. Brown* Court upheld seizure of an opaque party balloon. *Id.* at 742–43, 103 S.Ct. at 1543–44. In that case the Supreme Court held that

The fact that [the officer] could not see through the opaque fabric of the balloon is all but irrelevant; the distinctive character of the balloon itself spoke volumes as to its contents—particularly to the trained eye of the officer. *Id.* at 743, 103 S.Ct. at 1544.

If the fact that the officer in *Texas v. Brown* could not see through the opaque fabric of the party balloon was irrelevant, it follows that the fact the DEA agent in the instant case could not see through the opaque fabric of the folded and taped business envelope is equally irrelevant. Moreover, the remaining two elements of the three-pronged "plain view" analysis are clearly met in the instant case. This Court has found that the DEA agents had a reasonable belief that criminal activity was afoot prior to their detention of Defendant. The initial stop of Defendant's vehicle was permissible, therefore, under *Terry v. Ohio* as articulated in *Michigan v. Long* relevant to a *Terry*-stop of a motor vehicle. Finally, the arresting DEA agent has testified that discovery of the contraband was an inadvertent incident of his limited search of the vehicle's passenger compartment for weapons. There is no evidence that the agent knew in advance the location of the contraband or that he relied upon the plain view doctrine as a mere pretext. This Court holds, accordingly, that the warrantless seizure of the white business envelope and thus the crystal methamphetamine contained therein was not violative of the Fourth Amendment and is appropriately admissible as evidence in the United States' Title 21, U.S.C. § 841(a)(1) prosecution of Defendant.

## CONCLUSION

For the above reasons, and based on the evidence adduced at the suppression hearing, the Motion to Suppress Evidence is hereby DENIED.