

Decided April 7, 1989

714

IN THE DISTRICT COURT
FOR THE
NORTHERN MARIANA ISLANDS

UNITED STATES OF AMERICA,　　　)　　　CR. NO. 89-00003
　　　　　　　　　　　　　　　　)
　　　　Plaintiff,　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　)　　　DECISION RE:　MOTION TO
　　　　　　　　　　　　　　　　)　　　SUPPRESS EVIDENCE
APOLINARIO J. CUYSON, JR.,　　　)
　　　　　　　　　　　　　　　　)
　　　　Defendant.　　　　　　　)
_____)

On March 20, 1989 a hearing was conducted to consider Defendant Apolinario J. Cuyson, Jr.'s Motion To Suppress Evidence, specifically a suitcase and the contents in the suitcase. The motion asserted that Defendant was subjected to an unreasonable search and seizure in violation of the rights guaranteed to him pursuant to the Fourth Amendment of the United States Constitution and the Third Amendment of the Constitution of the Northern Mariana Islands.

FACTS

Defendant, a Philippine national, visited Saipan. He was scheduled to depart on a February 9, 1989 airline flight to Guam where he was scheduled to board a connecting flight to the Philippines.

715

Defendant and three companions rode in a rental car towards the Saipan airport a few hours before Defendant's scheduled flight time to ensure that Defendant would be able to timely board the flight. The companions, Alberto Vellarde, Wilfred Cayanan and Amado Samortin, are also Philippine nationals. The car was driven by Vellarde and leased by Cayanan.

Vellarde drove towards the airport on an unpaved road. He stopped the car when he heard a vibrating sound, stepped out of the car, and attempted to fix it. A brown pick-up truck approached and Vellarde signaled the truck driver to drive around the car. The truck stopped.

A Commonwealth of the Northern Mariana Islands ("CNMI") policeman, Detective Sakao, drove the truck and a second policeman, Detective Ayuyu, was Sakao's passenger. The policemen wore plain clothes and carried handguns which were concealed.

Ayuyu stepped out of the truck, approached the car, and displayed his police badge. He testified that he approached the car to determine whether the car occupants knew Cayanan and his whereabouts; CNMI policemen considered Cayanan a potential witness to a February 8, 1989 Saipan burglary and wanted to talk with him.

Ayuyu acknowledged that neither he nor Sakao had reason to suspect or believe that Cayanan was in the car. They had never seen Cayanan, who, based on his general physical appearance, is indistinguishable from many of the Philippine nationals living on Saipan.

The car occupants ("Detainees") were asked if Cayanan was

in the car. They identified Cayanan to the policemen. Vellarde informed the policemen that the car was enroute to the airport.

Ayuyu testified that during the initial confrontation he told Defendant, Vellarde and Samortin that they could leave and were not under arrest. Ayuyu admitted that at that time no probable cause existed to arrest any of the Detainees. In any event, the policemen then either "invited" or "told" the Detainees to proceed to the police station.

Before driving to the station, Vellarde saw Defendant speak to one of the policemen. Defendant, holding his passport and airline ticket in his hand, explained that he was enroute to the airport where he was scheduled to depart from Saipan on a commercial airline flight. A policeman examined Defendant's passport and ticket and told him there were a lot more flights to Guam.

Defendant did not believe that he or the other Detainees were free to reject the policemen's "invitation" to proceed to the police station. Defendant, a foreign national, testified that he is unfamiliar with CNMI police procedures but that under Philippine police procedure a person refusing to comply with a policeman's request might be shot.

Defendant returned to the car, now operated by Cayanan. They altered their destination by making a U-turn, turning away from the airport and driving in the opposite direction, towards the police station.

The policemen's truck closely followed the Detainee's car

717

throughout the trip to the police station. The Detainees attempted to detour from the route so that Defendant could return to his hotel. As Cayanan turned the car towards the hotel, the policemen sounded their siren. Vellarde heard the siren, looked at the truck, and saw the policemen motion the car to proceed to the police station.

Defendant got out of the car and asked the policemen if he could return to his hotel. One of the policemen responded by waving the back of his hand, indicating to Defendant that he was not free to deviate from the route to the police station or to travel anywhere except to the police station.

The Detainees resumed their journey to the police station. Ayuyu testified that the entire trip was completed in three to four minutes; Defendant estimated that the trip lasted 15 minutes.

The Detainees drove into the police station parking lot. A policeman told the Detainees where to park their car. Ayuyu testified that Sakao told the Detainees where to enter the station. Ayuyu also testified that before Defendant, Vellarde and Samortin entered the police station he told them that they were not under arrest and were free to leave. Defendant and Vellarde testified that nobody told them they were free to leave.

Policemen escorted the Detainees into a small room ("the main room") inside the police station. The main room measured approximately eleven feet by eleven feet and contained a table, desk, chair, sofa, and telephone. The Detainees were unable to see

**718**

through the lone window in the room and sat side-by-side on the couch.  An exit was located through a hallway near the door.

Police Sergeant Camacho, one of the policemen responsible for handling the February 8, 1989 burglary investigation, testified that two police officers were present in the main room and implied that Defendant was free to leave the room since he had not been told that he was under arrest.  Ayuyu and Defendant testified that at least three policemen were present in the room.  Since the atmosphere in the room was dominated by the presence of policemen, Defendant did not believe he was free to leave the room.

At least fifteen minutes elapsed before policemen began questioning the Detainees.  During that delay, Defendant asked for and received permission to use a telephone.  A policeman escorted Defendant into a second room where a telephone was located.  The policeman allowed Defendant to use the telephone but sat three feet away from Defendant and monitored his telephone conversation.

After the telephone conversation the policeman escorted Defendant back towards the main room.  Defendant requested permission to use the restroom but was told to wait.  At that time, Defendant understood that he was not free to leave the room unless accompanied by a policeman, that policemen would monitor his telephone conversations, and that policemen would regulate his bathroom privileges.

Defendant re-entered the main room and saw that his suitcase, which he left in the car, had been placed on a table in the main room.  The suitcase had been removed from the car without

**719**

Defendant's knowledge or consent and was apparently being detained by the policemen.

Policemen separated the Detainees and escorted each to a different room in the police station. Each Detainee was then questioned. Sergeant Camacho testified that Cayanan, Vellarde, and Samortin were finger-printed during the questioning procedure. He maintained that none of the Detainees, at that time, were told that they were under arrest because they had not been placed under arrest by the policemen.

Ayuyu questioned Defendant in a small windowless room. Defendant testified that Ayuyu did not inform Defendant of his right to an attorney, did not inform Defendant of his right to refuse to answer questions, and did not tell Defendant that his answers to questions could be used as evidence.

Ayuyu placed before Defendant two pieces of paper. The papers listed questions Ayuyu had asked Defendant and Defendant's responses. Defendant's signature appears on both pieces of paper, which were admitted as evidence. Defendant was not provided with an attorney before signing the list. He claims that he requested an attorney before signing, but the request was, in effect, denied when a policeman responded to the request by telling Defendant that he was not under arrest. Notations on one of the pieces of paper indicate that the list was prepared at 4:55 p.m. and signed by Ayuyu at 5:12 p.m.

A policeman escorted Defendant into a hallway. Defendant testified that while in the hallway he again requested an attorney,

720

but the request was disregarded, and effectively denied, by a policeman who replied that an attorney would cost Defendant $100 per hour; the policeman purportedly conveyed the request to a second policeman in a tone of voice indicating that the first policeman was mocking the request. The first policeman then escorted Defendant back into the main room.

Defendant asked for and received permission to use the telephone a second time. He telephoned Cayanan's sister, Violi Elbo, and asked her to bring an attorney to the police station. Elbo arrived at the police station, but was not accompanied by an attorney. Policemen still had not told Defendant he was under arrest.

Policemen then contacted a local restaurant owner and asked him to come to the police station to determine whether the Detainees had patronized his restaurant on February 8, 1989. Sergeant Camacho's testimony indicated that the owner arrived at the station at 5:30 p.m. Policemen did not conduct an impartial line-up of suspects but rather the owner was randomly escorted throughout the police station to look at people, including the the Detainees, to identify February 8, 1989 restaurant patrons. The Detainees were not advised that the policemen were conducting an identification determination nor were the Detainees told that they had the right to an attorney.

A memorandum signed by Detective Frank Camacho indicated that the restaurant owner identified Cayanan, Vellarde and Samortin as having been February 8, 1989 restaurant patrons. Detective

721

Camacho signed the memorandum at 6:30 p.m. on February 9, 1989. The memorandum was admitted as evidence.

The policemen confiscated and copied Defendant's passport and airline ticket. Sergeant Camacho claims the passport and ticke : were returned to Defendant at the police station. Defendant claims they were not.

Policemen eventually requested that Defendant sign a Consent To Search form and open his suitcase for inspection. Defendant refused both requests. Police repeated the requests and Defendant repeated his refusals. Ayuyu verified that police used language indicating to Defendant that compliance with their request to inspect the suitcase and its contents would be compelled by warrant if Defendant continued to refuse their requests.

Defendant, without advice of counsel, ultimately signed the Consent To Search form. The form, introduced as evidence, was signed at 6:55 p.m., nearly three hours after Defendant was "invited" to the police station, two hours after his initial questioning by Ayuyu, and 20 minutes after his flight to Guam was scheduled to leave Saipan.

Policemen furnished Defendant with a wrench to force the suitcase open. Defendant pried the suitcase open and policemen discovered goods suspected to have been stolen during the February 8, 1989 burglary. Policemen then told Defendant, for the first time, that he was under arrest.

## ANALYSIS

The Fourth Amendment guarantees the right of persons and their belongings to be secure against unreasonable searches and seizures and prohibits the issuance of warrants except upon probable cause. U.S. Const. Amend. IV; see also, N.M.I. Const. §3.

The Fourth Amendment protects individuals against arrests made without probable cause to believe that a person is committing or has committed a crime. Karim-Panahi v. Los Angeles Police Dept., 839 F.2d 621, 624 (9th Cir. 1988); U.S. v. Espinosa, 782 F.2d 888, 890-891 (10th Cir. 1986) (describing three identified categories of police/citizen encounters) ("Espinosa"). An arrest is a seizure characterized by a highly intrusive or lengthy search or detention. Espinosa, supra.

The Fourth Amendment also provides protection against law enforcement activities involving seizures of persons, including brief detentions short of traditional arrests. U.S. Const. Amend. IV; N.M.I. Const. §3; see, I.L.G.W.U., AFL-CIO v. Surek, 681 F.2d 624, 629-630 (1982), cert. granted, I.N.S. v. Delgado, 461 U.S. 904, 103 S.Ct. 1872 (1983), rev'd on other grounds, 466 U.S. 210, 104 S.Ct. 1758 (1984), on remand, 736 F.2d 1340 (9th Cir. 1984) ('Delgado"). A seizure occurs when a police officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." Terry v. Ohio, 392 U.S. 1, 20 n.16 (1968); Robins v. Harum, 773 F.2d 1004, 1009-10 (9th. Cir. 1985). Once a seizure occurs, it continues throughout the time the person is in custody. Robins, supra. The Fourth Amendment requires that such

723

seizures be based on founded suspicion or probable cause. U.S. v. Beale, 674 F.2d 1327, 1329-1330 (1982), cert. granted and vacated, 463 U.S. 1202, 103 S.Ct. 3529 (1983), on remand, 731 F.2d 590 (1983), on rehearing, 736 F.2d 1289 (1984) ("Beale").

The question raised by the facts in this case is whether Defendant's Fourth Amendment protections were violated by arresting officers. To answer that question the Court must first determine when Defendant's arrest occurred and whether, at the time the arrest occurred, arresting officers had probable cause to believe Defendant was committing or had committed a crime.

Policemen initially confronted Detainees as their car was parked beside or within an unpaved road. Defendant contends that the police effectively restrained him from continuing his journey to the airport, and subsequently restrained him from returning to his hotel. Defendant further contends that the restraint constituted an arrest. The prosecution disputes both contentions.

The determination of whether an arrest has been made, for Fourth Amendment purposes, does not depend on whether police officers announce that they are placing a person under arrest. U.S. v. Rose, 731 F.2d 1337, 1342 (8th Cir. 1984), cert. denied, 469 U.S. 931, 105 S.Ct. 326 (1984). Rather, the determination of precisely when the arrest occurs depends on the facts of the particular case. U.S. v. Levy, 731 F.2d 997, 1000 (2d Cir. 1984).

The key to making that determination is whether a reasonable person would believe under the circumstances that he is not free to leave. Cf. U.S. v. Ceballos, 812 F.2d 42, 48-49 (2d

Cir. 1987). A reasonable person can understand from the circumstances surrounding inquiries made by law enforcement officials that he is no longer free to move about without the officials' consent and is arrested, despite being told by the officials that he is <u>not</u> under arrest. <u>U.S. v. Johnson</u>, 846 F.2d 279, 283 (5th Cir. 1988).

A person's alienage may play a role in determining whether the person believes he is not free to leave, but under arrest. For example, the Ninth Circuit Court of Appeals found that a defendant foreign national's lack of familiarity with U.S. police procedures, his alienage, and his limited ability to speak and understand the English language contributed significantly to the amount of coercion necessary for a reasonable person to conclude that the defendant had been arrested by the time he was escorted by law enforcement officials to their office. <u>U.S. v. Moreno</u>, 742 F.2d 532, 536 (9th Cir. 1984).

Stops of persons travelling in automobiles are seizures within the meaning of the Fourth Amendment. <u>Nicacio v. U.S.I.N.S.</u>, 797 F.2d 700, 700-702 (9th Cir. 1985). Other circumstances that might indicate a seizure, even where the person did not attempt to leave, include: (1) use of language or tone of voice indicating that compliance with an officer's request might be compelled, <u>Benitez-Mendez</u>, <u>supra</u>; (2) the presence of several officers, physical escort by officers to areas closed to the public, placement in a small room, and constant presence of at least one officer, even during trips to use the restroom or to the telephone,

Anderson, supra; (3) impairment of person's mobility, a request that the person follow an officer or that the person otherwise alter his destination, schedule, or location, lengthy questions, an atmosphere dominated by law enforcement personnel, Beale, supra; and, (4) detention of a person and his suitcase where it is apparent that law enforcement officials would not have permitted the person to leave or remove his suitcase during an investigation. U.S. v. Martell, 654 F.2d 1354, 1359 (9th Cir. 1981), cert. denied, 463 U.S. 1213, 103 S.Ct. 3551 (1983).

The Court concludes that Defendant's arrest occurred when he was required to go to the police station. From that point onward, his movement was arrested and he was not at liberty to leave. This conclusion is based on the following facts: (1) the Detainees were confronted by two policemen; (2) as a result of the confrontation, policemen told the Detainees that they were "invited" to the police station; (3) Defendant and his companions, believing that they were not free to reject the invitation, altered their destination by turning away from the airport and driving in the opposite direction, towards the police station. At that point Defendant's movement was arrested.

Under those circumstances, any reasonable person would believe that Defendant was not free to reject the policemen's "invitation" to the police station. Rather, a reasonable person would understand that Defendant was not free to move about and was, therefore, under arrest.

Even if the Court were not to conclude that the arrest

**726**

took place on the road, the actions of the police subsequent to that initial encounter lead the Court to conclude that an arrest took place long before police officers opened the suitcase and informed Defendant that he was under arrest. The circumstances which support this conclusion are that the police officers: (1) maint ined continual surveillance of the Detainees' movements from the point of the initial encounter on the road throughout the trip to the police station, following directly behind their vehicle, and preventing the Detainees from altering their course to the station; (2) directed the Detainees' movements in the police station parking lot; (3) escorted Defendant into an area of the police station closed to the public; (4) led Defendant to various rooms inside the station, and subjected him to constant police surveillance; (5) questioned Defendant in an atmosphere dominated by policemen; (6) contacted a witness to identify Defendant and failed to advise Defendant he would be subject to an identification procedure; (7) monitored Defendant's telephone conversations; (8) regulated Defendant's bathroom privileges; (9) detained Defendant's luggage; (10) examined and copied Defendant's airline ticket and passport; (11) used language and tone of voice indicating that Defendant's compliance with their requests might be compelled; (12) urged Defendant to sign a consent form authorizing a search of his luggage; and (13) advised Defendant that they would obtain a warrant if he refused to open his suitcase.

Defendant's detention was highly intrusive, lasting nearly three hours. The detention caused Defendant to miss his

727

scheduled airplane flight.  At the police station, Defendant understood that he was not free to use the bathroom; to seek the advice of counsel; or to leave the main room, even to make telephone calls, unless accompanied by a policeman,

Testimony by prosecution witnesses that Defendant was "invited" to the police station and was free to leave any time before opening his suitcase defies credulity.  Whether the police officers believed Defendant was free to leave at any time before he opened his suitcase is irrelevant because Defendant reasonably did not think he was at liberty and that he was under arrest.  Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319 (1983).

The policeman's testimony implies that Defendant could have rejected the policemen's "invitation" to the police station, continued his journey to the airport, detoured away from the route leading to the police station, returned to his hotel, refused to enter the police station, refused to remove his suitcase from police custody and leave the police station, or rejected the policemen's request to inspect his luggage.  The Court finds that, if Defendant was at liberty to reject the "invitation", he would have continued his journey to the airport and boarded the flight for which he had purchased a ticket; if he was at liberty to detour away from the route leading to the police station, he would have returned to his hotel; if he was at liberty to avoid entering the police station, he would not have entered the station; and if he were at liberty to remove his suitcase from police custody, he

**728**

would have removed it before policemen had the opportunity to inspect it.

Under the circumstances, any reasonable person would believe that Defendant was not free to leave the police station and was not free to reject the request to inspect his suitcase. Rather, a reasonable person would understand that Defendant was not free to move about without police consent and was therefore under arrest.

█ 6] The arresting policemen ignored Defendant's Fourth Amendment rights and violated his protection against unreasonable search and seizure. Accordingly, Defendant was being illegally detained when he purportedly consented to the search of his suitcase, the consent was tainted by the illegality and was therefore ineffective to justify the search, and the suitcase and its contents must be suppressed. <u>Florida v. Royer</u>, 460 U.S. 491.

## CONCLUSION

█ When the validity of a search rests on consent, the prosecution has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given. <u>Royer</u>, 103 S.Ct., at 1323-1324. The prosecution has failed to meet that burden.

Based on the facts of this case, Defendant's arrest occurred when he was required to go to the police station. From that point onward, his movement was arrested and he was not at liberty to leave. Arresting officers, at that time, had no

probable cause to believe he was committing or had committed a crime. The requisite probable cause did not exist until after Defendant's suitcase was opened at the police station and police examined the contents of the suitcase. Since Defendant was being illegally detained when he purportedly consented to the search, the consent was tainted and therefore was ineffective to justify the search. Accordingly, the suitcase and its contents, the fruits of a poisonous tree, will be suppressed from evidence at trial.